2022 IL App (1st) 220410
No. 1-22-0410
Opinion filed December 9, 2022

SIXTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* D.D., a Minor, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19 JA 1373 |
| | ) | |
| A.C., | ) | The Honorable |
| | ) | Patrick Murphy, |
| Respondent-Appellant.) | ) | Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justice Walker concurred in the judgment and opinion.
Justice Walker also specially concurred, with opinion.
Presiding Justice Mikva dissented, with opinion.

**OPINION**

¶ 1    Respondent, A.C., appeals the trial court's termination of her parental rights. The trial court found her to be an unfit parent and found it to be in the best interests of her 10-year-old son, D.D., to terminate A.C.'s parental rights. D.D.'s father is deceased, and D.D. is presently in foster care with his father's parents, or grandparents, who hope to adopt him. The father's parents have stated that they will not permit contact with A.C. if they are permitted to adopt. For the following reasons, we reverse.

¶ 2                                    BACKGROUND

¶ 3                              I. Parties and Proceedings

¶ 4          A.C., is the mother of D.D., who was born on February 24, 2012. D.D. is presently 10 years old and in the fourth grade. In November 2019, when D.D. was seven years old, the State filed a petition for adjudication of wardship. On March 11, 2020, a few weeks after he had turned eight years old, the trial court found that he was neglected due to a lack of care and an injurious environment, and he was adjudged a ward of the court. When D.D. was nine years old, the State moved on August 9, 2021, to permanently terminate A.C.'s parental rights and to appoint a guardian with the right to consent to adoption. D.D.'s foster parents, who are also his paternal grandparents, want to adopt him but will not permit him contact with his mother.

¶ 5          The State alleged that A.C. was an unfit mother on three separate grounds: (1) "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare" (750 ILCS 50/1(D)(b) (West 2020)) (hereinafter, Ground B),  (2) "[f]ailure *** (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child *** during any 9-month period following the adjudication of neglected *** minor *** or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication" (750 ILCS 50/1(D)(m) (West 2020)) (hereinafter, Ground M), and (3) "[i]nability to discharge parental responsibilities" due to "mental impairment, mental illness or an intellectual disability" that "extend beyond a reasonable time period" (750 ILCS 50/1(D)(p) (West 2020)) (hereinafter, Ground P). For Ground M, the State chose a nine-month period, beginning on March 14, 2020, and ending on December 24, 2020, when D.D. was eight years old. The nine-month period began two years prior to the termination of A.C's parental rights.

¶ 6          The fitness hearing was held via Zoom on January 25, 2022. The State called (1) Dr. Krissie Smith (Dr. Smith), a clinical psychologist, who supervised Dr. Jokae Ingram but had no direct contact with A.C. or D.D.; (2) Dr. Ingram, the psychologist who completed the parenting capacity assessment on September 4, 2020, for A.C. which concluded that A.C. could be an appropriate parent after completion of services; (3) Lashonda Ross, who was involved in clinical staffing but had no direct supervision over this case; (4) Regina Ruffin, who held monthly staff meetings with Deja Smith (Smith), a caseworker; (5) Gabrielle Ellison, who held eight phone therapy sessions with A.C. starting in July 2020, but who terminated that therapy as unsuccessful on September 29, 2020, a few weeks after Dr. Ingram's September 4, 2020, assessment of appropriateness; (6) Shannon Stewart, a case aide who observed one in-person visit and two virtual visits between mother and child in 2020; (7) Shannon Dolan, who supervised the caseworkers in this case from November 2019 to November 2020, but had little contact with A.C. or D.D.; and (8) Smith, a caseworker who was first assigned to this case in December 2020, when the nine-month period chosen by the State had ended. A.C. testified on her own behalf and called Dr. Mohammed Tarawneh, a psychologist, who conducted a clinical evaluation of A.C. on March 10, 2021, and held weekly therapy sessions with A.C. from March to July 2021.The testimony of all witnesses is described in the section below.

¶ 7          After the evidentiary phase of the fitness hearing was complete, the court and the parties adjourned and returned for final arguments on March 9, 2022. After listening to arguments, the trial court found A.C. unfit, stating:

         "In this case, the child was found, not only in a filthy, garbage strewn place with drugs lying around, he didn't know how to brush his teeth. He wasn't potty trained. And

within a week or two of being sent to live with his uncle, he accomplished these matters."

This finding contradicted the testimony of Dolan, the caseworkers' supervisor, who testified at the fitness hearing that a report from D.D.'s therapy indicated that, in November 2020, or almost a year after the case came to the Department of Children and Family Services (DCFS), D.D. continued to wear Pull-Ups and sometimes wet himself during the night. The trial court stated that it "found the witnesses, particularly Ms. Ellison to be very, very credible," and the court reiterated Ellison's conclusion that A.C. had "circular thinking" which precluded A.C. from forming age-appropriate expectations. When asked under which ground it had found unfitness, the trial court replied all three.

¶ 8        After finding unfitness, the trial court proceeded to a best interests hearing. At the best interests hearing, also held on March 9, 2022, two witnesses testified: (1) Smith, the caseworker who had testified previously at the fitness hearing, and (2) M.K., the paternal grandmother and foster mother. Their testimony is also described below in the following section. At the conclusion of the best interests hearing, the trial court found:

> "[I]n some ways it's an easy case and in some ways it's a difficult case. But, the child was living in deplorable circumstances and was years behind his chronological age when [he] came in. Now, he is participating in all kinds of activities and on the honor roll at school. He shows magnificent improvement.
>
> It's clearly in his best interest that I terminate rights and appoint [a guardian] with the right to place."

The court then entered a goal of adoption.

¶ 9                                    II. Testimony

¶ 10                                    A. Fitness Hearing

¶ 11        At the start of the Zoom fitness hearing, the following 11 exhibits were admitted without objection: exhibit No. 1, integrated assessment for the minor and family, dated February 5, 2020; exhibits Nos. 2, 3, 4 and 5, four service plans dated, respectively, January 2, 2020, May 4, 2020, November 10, 2020, and May 18, 2021; exhibit No. 6, juvenile court clinic parenting capacity assessment, completed on September 4, 2020, by Dr. Ingram; exhibit No. 7, records from Advocate Hospital for A.C.; exhibit No. 8, documents from Ellison, A.C.'s phone therapist for two months in 2020; exhibit No. 9, a document, dated May 1, 2021, from Dr. Tarawneh, who held weekly therapy sessions with A.C. from March to July 2021; exhibit No. 10, notes from case aide Stewart; and exhibit No. 11, a document, dated May 29, 2020, by Victoria Woodley, from Metropolitan Family Services.

¶ 12        We provide the testimony in detail below because it shows an almost bewildering array of recommendations, sometimes contradictory, by a shifting assembly of providers and caseworkers.

¶ 13        The first witness called by the State was Dr. Smith, a clinical psychologist, who was associate director of the Cook County Juvenile Court Clinic. The clinic is a partnership between Northwestern University and Cook County. Dr. Smith supervised Dr. Ingram, the psychologist at the clinic who completed A.C.'s parenting capacity assessment, on September 4, 2020. In 2020, after the COVID-19 pandemic began, the clinic switched to remote assessments. In this case, Dr. Ingram was able to observe remotely as A.C., her son, and a caseworker played in-person in a park. Although Dr. Smith reviewed and signed Dr. Ingram's assessment of A.C., Dr. Smith herself had no interactions with either A.C. or D.D.

¶ 14        Dr. Ingram testified that her first interview of A.C. was on July 2, 2020, via Zoom. Dr. Ingram received and relied on A.C.'s prior medical records which showed that A.C. had been previously diagnosed with, and hospitalized for, anorexia nervosa, which is an eating disorder. During the July 2, 2020, interview, A.C. told Dr. Ingram that D.D., who was eight years old, needed to wear "Pull-Ups." A.C. believed that D.D. needed to wear Pull-Ups for another couple of years until he was able to judge when he needed to go to the bathroom. Dr. Ingram testified that D.D. was "obviously" developmentally delayed with respect to "potty-training." During the July 2, 2020, interview, A.C. stated that D.D. needed a special diet, that he had missed over 20 days of school back when he was in kindergarten, and that he did not interact with other children in first grade when he was ill.

¶ 15        Dr. Ingram testified that she reviewed D.D.'s medical records and found that, often, medical personnel did not corroborate A.C.'s reasons for bringing him to the hospital. For example, A.C. reported that D.D. had seizures and that was not corroborated. School records indicated that staff reported that he was unclean and that A.C. had called multiple times regarding what D.D. ate at school and to make sure that he did not eat the food at school.[1] Dr. Ingram had one parent/child observation, which occurred on August 3, 2020, for 78 minutes. A caseworker was with A.C. and D.D. in the park, and Dr. Ingram observed the three of them through "WebEx," which Dr. Ingram explained was a video-conferencing application.

¶ 16        Dr. Ingram testified about her observations during the August 2020 visit: "[I]t appeared that [A.C.] had a loving and caring relationship with her son, [D.D.]; and it was reciprocated.

---

[1]Dr. Ingram's testimony was somewhat confusing because she used the pronoun "they" within the same sentence to refer both to A.C. and to medical and school staff. For example, Dr. Ingram testified that "they" reported that D.D. had seizures, apparently referring to A.C., but that "they" did not corroborate this fact, apparently referring to medical personnel.

He was, [*sic*] she was attentive to him throughout the observation. They laughed; they talked during the whole visit that I observed so it was a very positive visit."

¶ 17    Dr. Ingram memorialized these observations, as well as her recommendations, in her report. Dr. Ingram recommended individual long-term therapy, medication management sessions, eating disorder treatment, substance abuse treatment, and additional parenting services. Dr. Ingram thought it was important that A.C. receive treatment to ensure that both A.C and D.D. were receiving proper nutrition. Although A.C. denied drug abuse or overusing her prescription medicine, Dr. Ingram noted that there were "allegations that she overused her prescribed medications." However, Dr. Ingram did not specify the source of these allegations.

¶ 18    Dr. Ingram testified that she reviewed "D.C.F.S. records" that indicated that A.C.'s home was cluttered and unclean. The records included black-and-white photos of the home that Dr. Ingram reviewed. In Dr. Ingram's opinion, the issue was "more towards hoarding." The photos showed clothes and objects on the floor, and that some rooms were "impassable."

¶ 19    On cross examination, Dr. Ingram testified that she believed A.C.'s reporting about her history and history of events was reliable. A.C. informed Dr. Ingram that, after D.D. was taken into DCFS custody, A.C had obtained a restraining order against her brother to prevent him from living in A.C.'s house. Dr. Ingram had no reason to doubt that was true. Dr. Ingram did not, herself, diagnose A.C. with anorexia or make any mental health diagnosis of A.C. According to the medical records which Dr. Ingram received, A.C. was first diagnosed with anorexia when A.C. was 13 or 14 years old. Dr. Ingram testified that her review of A.C.'s medical records showed that, although A.C. had been hospitalized several times for anorexia, including in her thirties, A.C. had not been hospitalized or treated for it in over 10 years, and the last time was before D.D. was born.

¶ 20        Dr. Ingram testified that D.D.'s medical records indicated that, when he was born, he was "[j]aundiced" and had "G-e-r-d."[2] When D.D. was in the "N.I.C.U.," someone called DCFS concerned about A.C.'s mental health and how it would affect her parenting. When Dr. Ingram was conducting her assessment, A.C. had met with her therapist, Ellison, three times. Ellison reported that A.C. was " 'determined' " and " 'extremely committed.' "

¶ 21        During Dr. Ingram's observation in August 2020 in the park, Dr. Ingram noted that A.C. was very affectionate with D.D. and D.D. was very affectionate with A.C. While in the park, A.C. and D.D. held hands, A.C. encouraged D.D. to drink water because it was very hot outside, and A.C. provided D.D. with snacks. A.C. was concerned with D.D.'s comfort in light of the heat. With respect to COVID-19 protocols, A.C. made sure D.D. used hand sanitizer and wore a mask. A.C. and D.D. used the swings together, and A.C. gave D.D. a piggyback ride. They laughed and talked the whole time. Dr. Ingram did not observe any deficits in A.C.'s functioning at that time, and A.C. was responsive to D.D's needs.

¶ 22        Dr. Ingram testified that a caseworker, Robert Hull, was physically present with D.D. and A.C. in the park. Hull informed Dr. Ingram that Dr. Ingram's observations of that particular visit were consistent with the agency's observations of prior visits. Dr. Ingram testified that the conduct during the visit gave her no reason for concern. One of Dr. Ingram's recommendations was for dialectical behavior therapy,[3] which she testified could not be completed in three weeks or three sessions and required, in her opinion, "at least six months" of treatment. Dr. Ingram opined that the therapy required "at least six months to eighteen months *** to be effective with people," such as A.C., who "have more than one mental-health

---

[2]This appears to be a reference to gastroesophageal reflux disease. "N.I.C.U" appears to be a reference to a neonatal intensive care unit.

[3]The trial court interjected that this was otherwise known as "[o]ld fashioned therapy."

diagnosis." Dr. Ingram stated that she wanted A.C. to make progress first in her individual therapy before beginning the other services that Dr. Ingram had also recommended. One of the other recommended services was "Medication Management." Dr. Ingram was aware that A.C. had been prescribed several medications by a psychiatrist.

¶ 23     In conclusion, Dr. Ingram testified that it was her opinion that, if A.C. "engage[d] consistently with the therapeutic services recommended," A.C. would be an appropriate parent for D.D.

¶ 24     The State next called Ross, a program director for child welfare cases at Volunteers of America (VOA). Although Ross was involved in arranging clinical staffing for this case, she had no direct or supervisory authority over this case.[4] The next witness was Ruffin, a VOA foster care supervisor since July 2021. Ruffin testified that her only connection with this case was supervising D.D.'s caseworker, Smith. Ruffin testified that, prior to July 2021, A.C. had texted D.D. about his "Adoption Goal," and D.D. had texted his grandparents that he did not want to be adopted. Based on this information, "the agency"[5] decided that "no unsupervised contact should be granted." Ruffin testified that VOA was not opposed to termination because A.C. had "not engaged in the necessary services" required in "the Integrated Assessment." On cross, Ruffin testified that Smith, the caseworker, had told her about the texts.

¶ 25     The next witness, Ellison, a therapist at UCAN,[6] testified that she had been A.C.'s therapist for two months in 2020. Ellison is a licensed professional counselor. After A.C. was referred for therapy by DCFS, Ellison held eight phone sessions with A.C. The first phone call

---

[4]Ross testified that, from March to July 2020, all visits were virtual, and from July 2020 until June 2021, there were bi-weekly in-person visits in addition to virtual visits. After June 1, 2021, VOA began all weekly in-person visits.

[5]Ruffin did not specify who at VOA made this decision.

[6]Ellison did not testify what the acronym UCAN stood for.

was on July 21, and the last was on September 29, 2020. Ellison opined that, during these eight phone calls, A.C. "made no progression. She felt as if everything was happening to her, and she played no part in everything that happened." As a result, Ellison discharged A.C. from therapy on September 29 as "unsuccessful."[7] When asked why therapy was done over the phone as opposed to video, Ellison testified that, while typically she honored the client's request or "capabilities," she did not recall why the phone was utilized in this particular case.

¶ 26    In September 2020, Ellison wrote a letter to A.C. informing A.C. that her sessions would end. The letter stated: "Your circular thinking showcases an inability to recognize the parental expectations for healthy, age-appropriate development, and physical and emotional safety of your son." At the hearing, Ellison explained that what she meant by circular thinking was that, instead of accepting "accountability" that could lead to progress, A.C. thought "[e]verything is happening to me and we in turn are the victims." Ellison testified that, although both D.D.'s father and one of A.C.'s brothers had died of drug overdoses,[8] A.C. seemed unaware that the brother who lived with her was "on drugs." Ellison noted that the presence of drug paraphernalia was what led to this case being brought to DCFS's attention.

¶ 27    In her September 2020 letter, Ellison also wrote that A.C. lacked the "commitment to change and intra-personal honesty it takes to successfully make progress" in therapy. At the hearing, Ellison explained that whenever the conversation veered to a topic that was "substantial or could be of relevance to her progress, she would negate" it or "brush over it or shut it down immediately."

---

[7]Ellison's discharge of A.C. from this particular service occurred only a few weeks after Dr. Ingram's assessment that A.C. could be an appropriate parent upon completion of services.
[8]A.C. later testified that her brother had not died of drugs.

¶ 28    Ellison testified that, after the last phone call on September 29, 2020, she had no contact with A.C., except for a phone call from A.C. sometime later in 2020. Ellison could not recall the month in 2020 when A.C. called. While A.C. was in the office with her permanent caseworker, A.C. called to say that she was "totally caught off guard" by Ellison's termination of therapy. On cross, Ellison testified that the call was from both A.C. and A.C.'s caseworker and that it occurred on September 29, 2020.

¶ 29    On cross, Ellison acknowledged that, although A.C. was referred in February 2020, the first phone session was not held until months later, at the end of July. At the time of A.C.'s therapy, Ellison had approximately 22 other clients. Prior to Ellison's conversation with Dr. Ingram in which Ellison reported that A.C. was determined and committed to the process, Ellison had already held three of the eight phone sessions. Ellison could not recall whether she received a copy of the "Parenting Capacity Assessment" that Ellison participated in and that Dr. Ingram completed. Ellison agreed that she and A.C. had "not engage[d] in a full series of D.B.T. or Dialectical Behavioral Therapy." Ellison acknowledged that "circular thinking" was not a clinical term, and she was using the term "colloquially."

¶ 30    On cross, Ellison acknowledged that, in her discharge letter, she recommended that A.C. complete other training, such as domestic violence and drug counseling, before resuming individual therapy. Ellison was not aware, at the time, that this contradicted Dr. Ingram's recommendation regarding the sequence of these services.

¶ 31    After cross, the trial court examined Ellison, and respondent's counsel objected to the leading questions. The court summarized Ellison's testimony as opining that A.C. viewed herself as the victim, so that there was "no reason *** to get better," and then asked, "is that basically your testimony?" Ellison agreed.

¶ 32    The next witness, Stewart, a VOA case aide, testified that she observed a visit between A.C. and her son, D.D. in a park during the second part of 2020. A.C. provided snacks and bottles of water. At one point, A.C. gave D.D. a "PediaSure." and when Stewart later dropped D.D. off at home, the foster parent informed Stewart that D.D. was not supposed to have that. Stewart explained that PediaSure helped with nutrition and weight gain, and D.D. was "a healthy-sized boy." Respondent's counsel objected to the PediaSure testimony on relevance grounds. The trial judge agreed that he did not see the relevance, explaining: "She gave him one bottle of PediaSure; okay. What's the big deal?"

¶ 33    On cross, Stewart testified that the first visit she observed was on July 6, 2020, in a park. Stewart observed A.C. making sure that D.D. had an appropriate amount of water and rest, because it was hot outside. Stewart observed A.C. and D.D. praying together and talking about how his July 4 holiday went. She observed them playing games together on A.C.'s phone. During that visit, Stewart did not observe anything inappropriate or concerning. The next visit that Stewart observed was a virtual visit on November 16, 2020. Stewart observed A.C. talking with D.D. about specific classes, homework assignments, and activities, including karate and video games, and his plans for the upcoming Thanksgiving holiday. A.C. gave D.D. some tips for doing his homework, such as showing his work for math problems.

¶ 34    Stewart observed another virtual visit on November 30, 2020, where they again talked about particular classes and homework. A.C. and D.D. did an activity together, which was making a paper airplane. A.C. shared some suggestions about how to make a better plane and gave him encouragement to keep trying when his plane did not fly. They discussed COVID-

19 safety protocols and tips for being in quarantine, Christmas plans, and "The Grinch." Again, Stewart did not observe anything inappropriate or concerning during the virtual visits.[9]

¶ 35        Dolan, a supervisor in VOA's foster care department, testified that she supervised D.D.'s case from November 2019 until November 2020 but she had no direct contact with A.C., other than attending one or two court hearings and one mediation. Dolan supervised Deaundra Kerby, D.D.'s caseworker, from November 2019 to June 2020, and then again from October 2020 to November 2020. From July 2020 through September 2020, Kerby was on maternity leave, and during that time, VOA had a "Temp Worker" on the case.[10] During Dolan's supervision of the case, VOA did not recommend unsupervised visits, primarily because of reports of "prolong[ed] emotional goodbyes" that left D.D. upset and confused. Dolan testified that the reports of these goodbyes came to her from Kerby and some of the case aides who supervised visits, but Dolan could not name the case aides.

¶ 36        Dolan testified that services "recommended for reunification included [1] Domestic Violence Services, [2] a [Juvenile Court Assessment Program (JCAP)] Substance Abuse Assessment, and possible follow-up services as needed; [3] Parenting Classes and Coaching, [4] Individual Therapy, [5] Psychiatric Assessment, and [6] Parenting Capacity Assessment." Of these services, referrals were made only for (1) parenting classes, (2) individual therapy, and (3) the JCAP substance abuse assessment. No referral was made for domestic violence services because the decision was made to wait until individual therapy was completed, but

[9]At the end of her testimony, Stewart testified that she observed approximately five visits from July through November 2020, both in-person and virtual. However, she described only three in her testimony.

[10]The "Temp Worker" was Hull. Dr. Ingram had testified that Hull was physically present with D.D. and A.C. in the park when Dr. Ingram observed them. Hull was the one who informed Dr. Ingram that her observations of that visit were consistent with the agency's observations of prior visits.

that never happened. A.C. successfully completed parenting classes, but no referral was made for parenting coaching, although required. No referral was made for coaching because they were waiting for "input from the Individual Therapist." No referral was made for eating disorder services because that treatment was generally not covered by DCFS. After Ellison terminated A.C.'s therapy, no further referral was made for individual therapy. Dolan's understanding was that Ellison recommended that A.C. complete domestic violence services and substance abuse services before restarting individual therapy. However, as noted, Dolan testified that no referral for domestic violence services was ever made.

¶ 37        Dolan testified that, in November 2020, a meeting was held with Dolan, Kerby and Ross, the VOA program director for child welfare cases, and the three of them changed the permanency goal for D.D. from reunification to "Substitute Care Pending Termination of Parental Rights." Dolan's supervision of the case ended in 2020, when Kerby left the office and the case was taken over by another caseworker, Smith, who had a different supervisor, namely, Ruffin.

¶ 38        After direct examination, the court examined Dolan, asking the reason why D.D. came into the system in the first place. Dolan answered that there were controlled substances in the home that were in reach of the minor. The judge replied that he was "frustrated" because he "thought the case came in because the house was a complete mess" and D.D. was in diapers and not brushing his teeth. The court observed, "If there's drugs in the house; there shouldn't be; they could still be a good parent. The question was: was she a good parent when all *** this was going on? Did she make steps to improve; isn't that really why we are here, Miss Dolan?"

¶ 39    The court then asked Dolan if, in her opinion, A.C. made steps to improve the situation. Dolan replied that A.C. did make "some steps to improve" and "did make efforts to engage in services." Dolan observed that A.C. completed parenting classes and attended visits with D.D. consistently. However, "there were many areas of care opening *** about the lack of care" for D.D. "that appeared to not be comprehended." The court asked, "She didn't understand the situation; is that correct?" Dolan agreed.

¶ 40    On cross, Dolan testified that the case first came into the office in December 2019. A.C. complied with all of VOA's requests to sign consent and release forms, initially and again in March and August 2020. Respondent's counsel then asked Dolan about VOA's referrals. The first referral that VOA made was in February 2020 for the "Nurturing Parent Program." However, that turned out to be an inappropriate referral because D.D. was too old for the program. The next referral was for parenting classes in the spring, which A.C. completed successfully in June 2020. VOA recommended a JCAP substance abuse assessment on June 16, 2020, which A.C. completed and which indicated that she did not qualify for substance abuse services at that time. Dolan added that JCAP required a "drop" or drug test, which was not completed. However, Dolan acknowledged that A.C. had completed a drug test or "drop" with her agency prior to the assessment. The test had been positive for benzodiazepines and barbiturates, although these substances could be accounted for by A.C.'s documented drug prescriptions.[11] A.C. engaged in individual therapy until discharged, and no further referral was made during the 2½ months between the discharge and the goal change. No further referral was made because the therapist recommended that A.C. engage in domestic violence and

_____

[11]Smith, the caseworker who was assigned in December 2020, testified that A.C. had one positive drug test in November 2020 and, since then, there had been three negative tests.

substance abuse services first.[12] Dolan acknowledged that Dr. Ingram's report recommended just the opposite: that A.C. engage in individual therapy before beginning either domestic violence or substance abuse services.

¶ 41        Next, respondent's counsel asked Dolan about visitation. The plan, which A.C. signed in early 2020, called for a minimum of twice a week in-person visits. The plan changed in March 2020 due to COVID-19, and visits became virtual and for less time. Dolan testified that there was no other reason than COVID-19 for the restriction of A.C.'s visits in March 2020. Twice-a-week in-person visits resumed in July 2020. Dolan agreed that A.C. visited as much as she was allowed. If there was a conflict with her work schedule, A.C. was "pretty good about communicating with the caseworker" and rescheduling. On September 1, 2020, Dolan engaged in a mediation regarding this case, and the result was an agreement that visits would be twice a week and in person, plus phone calls. In December 2020, when the goal changed to termination, Dolan was not the supervisor at that time. However, Dolan testified that her agency would have stopped making referrals at that time because DCFS would have stopped paying for services after the goal changed. Dolan stopped being the supervisor in November 2020, shortly before the goal changed.

¶ 42        Dolan testified that a report of D.D.'s therapy indicated that, in November 2020, or almost a year after the case came to DCFS, D.D. continued to wear Pull-Ups and sometimes wet himself during the night.

¶ 43        The next witness was Smith, a VOA caseworker, who became A.C.'s caseworker in December 2020 after the former caseworker, Kerby, left the office. Smith did not make any

---

[12]However, Dolan had just testified that JCAP had concluded that substance abuse services were not warranted.

referrals for A.C. after becoming the caseworker. A.C. asked Smith "about how was she supposed to go about doing services" because, once the goal changed to termination, no referrals were made. Smith told her to "go through her insurance to possibly get services."

¶ 44        Smith supervised a total of seven visits between A.C. and D.D., with five of those visits being in-person. The five in-person visits occurred once a month, from January through May 2021, at a library, with each visit lasting approximately two hours. Smith asked A.C. to talk to Smith prior to the in-person visits concerning what A.C. intended to bring with her, and A.C. adhered to that directive. However, during the visit on May 17, 2021, Smith noticed that D.D. had an uncomfortable look on his face. Smith testified that D.D. looked "confused," and he looked at Smith and then looked at A.C.'s phone. This action prompted Smith to ask what A.C. had shown on her phone, but "he replied nothing." A.C. stated that she had not shown D.D. anything. After the May 17, 2021, visit, the agency moved the visits to Zoom so that nothing "could be said or shown without [their] seeing it on the screen."

¶ 45        Smith testified that, during the Zoom visits, Smith had the impression that A.C. was going down a list of questions. Smith felt that A.C. talked more about her feelings, saying things like "I love you." rather than talking about D.D.'s feelings. Smith did not discuss these impressions with A.C. since A.C. was not doing anything inappropriate.

¶ 46        On cross, the assistant public guardian asked what, if anything, did D.D. tell Smith about what his mother had told him on May 17, 2020. A.C. told D.D. that he was going to be adopted. Smith found that concerning because that should have been raised with D.D. by his therapist in a clinical setting.

¶ 47        On cross, A.C.'s counsel asked about an in-person visit on February 22, 2021, and Smith testified that A.C. brought Valentine's Day gifts and a birthday present, that they played

17

the card game "Uno," and that A.C. asked how school was going. Smith had no issues or concerns about that visit. During the March 15, 2021, visit, A.C. brought toys for her son, and they colored and did arts and crafts together. Again, Smith had no concerns about that visit. During the April 19, 2021, visit, A.C. brought D.D. new clothes and snacks. After VOA stopped making referrals, it was left to A.C to find those services on her own.

¶ 48    Smith testified that A.C. had one positive drug test in November 2020 and, since then, there had been three negative tests. In May 2021, five months after the goal changed to termination, VOA indicated that certain services, such as parent coaching, would be required for unification, but that those services were not available due to the goal change. Smith agreed that there were "no opportunities for [A.C.] to participate in those services at that time."

¶ 49    After the State rested and the trial court denied respondent's motion for a directed verdict, respondent called Dr. Tarawneh, a clinical psychologist, who was A.C.'s therapist after VOA terminated services. Dr. Tarawneh completed a mental health evaluation for her and saw her on a weekly basis from March 2021, through early July 2021, for a total of 20 visits. During those visits, A.C. improved and made progress in her therapy. As evidence of her progress, Dr. Tarawneh cited the fact that A.C. was able to find a job and work consistently. Dr. Tarawneh had no issues communicating with A.C. and no problems with her communication. Dr. Tarawneh agreed that she had progressed "to the point where she was ready to make the [next] step," which he believed was to see a psychiatrist who could assess the medication that she was taking. In the mental health evaluation, which he completed in May 2021 of A.C., he indicated that she had depression but that her thoughts were coherent, congruent, and logical.

¶ 50    The next witness was A.C., who testified that, when her caseworker informed her that the agency had changed the goal to termination, the caseworker also told her that she would

have to find her own "community-based" services. The services that A.C. was able to locate on her own were Dr. Tarawneh and, subsequently, the "Trauma Recovery Center" (TRC). She started services at TRC after her sessions with Dr. Tarawneh ended. A.C. testified that TRC provided "Counseling, Psychiatry, and a Caseworker or Social Worker." TRC provided a 16-week program, and A.C. was still seeing the caseworker. Through TRC, A.C. was able to see a psychiatrist. A.C.'s first doctor was Dr. Galecky, and A.C. was presently in the care of Dr. Alejandra Besterfeldt, whom A.C. had seen twice and was scheduled to see next month.

¶ 51    A.C. testified that, since the case started in November 2019, she had been taking prescription medicine that had been prescribed by a medical professional. The day after her "son was taken," she obtained a restraining order against her brother who had been living in her house. Her brother and his friends had contributed to the mess in the house. First, she obtained an emergency order and then a two-year order. When no one came to serve her brother with the emergency order, she called the police and he moved out. The town in which she lived restricted her ability to live in the house because of its condition, but she received permission to enter it in order to clean it up, which she did. A little over a month later, the town inspected the house and certified that it was clean. Respondent's counsel then introduced a letter from the town in December 2019 that certified that the house was clean and suitable for occupancy. The State stipulated to its admissibility. A.C. testified that a representative from the town visited the house again during the summer of 2021 and found no concerns.

¶ 52    A.C. testified that, after Kerby was assigned as her caseworker, A.C. made efforts to stay in communication with her about the services recommended by VOA. For example, A.C. found parenting classes and then asked VOA to send a referral for them. VOA communicated with her only by e-mail, and A.C. was not permitted to call. In the e-mails, A.C. always

"c.c.'d"[13] her attorney. In these e-mail exchanges, A.C. asked if they had sent referrals and advised them of when services were completed. Respondent's counsel introduced the e-mails, which the court admitted.

¶ 53    A.C. testified that her son knew how to brush both his teeth and his hair and that she was working with him on his ability to know when he had to go to the bathroom. A.C. stated, "I cannot imagine what my son thinks and feels since May 17th. He probably thinks that his mommy did not care; that I gave up, and that is not the case." The picture that she showed her son on her phone during an in-person visit was the picture of "a flood" that occurred at her work, and the surprised look was "his reaction." A.C. clarified that her brother who died was not on drugs, although he had attempted suicide. The brother who lived with her was the brother on drugs. When D.D. started school, A.C. asked the school if he could see a psychologist or counselor for therapy.

¶ 54    The trial court and A.C. then had the following exchange:

    "THE COURT: Ma'am, I saw pictures of that house; and, when you say you did everything you could, how could you live there with a little boy in a house in that condition?

    RESPONDENT'S COUNSEL: I would object to the form of the question.

    THE COURT: No; that's the whole; that's what this case is about. This case came in because this little boy was living in some of the worst circumstances I've ever seen in photographs and descriptions; and as I've said, I have been in terrible homes. I was the Public Guardian. I had to go into homes all the time with elderly people who suffer

_____

[13]Copied.

from Dementia and this; and I could not smell it; but, from what I saw there, ma'am, I didn't understand how you could have a little boy in that house.

A.C.: And I don't blame you for feeling that way. I did everything I could to [*sic*] coming home, having my brother have five friends in the house [*sic*] to making chicken grease all over the place. They didn't, they didn't care. When my brother would leave, I was throwing things away; doing everything I could. I could not stand living like that. I could not stand it. I was trying so hard and—

THE COURT: You did get him out of the house the day after your son was removed?

A.C.: Yeah, and I started, after I came home, I started cleaning. I was at the courthouse. Right after I took my drug screen after half of the day waiting to get my emergency [restraining order] until I got to see if I could get my two years [permanent restraining order] or whatever [time] they were going to give me [*sic*] for, you know to keep my brother away.

THE COURT: Now, you heard Miss Ellison testify, you know, it's to me[,] it was a terrible situation; but the child was taken away and there was a ruling made that you neglect[ed] him; but now we are at a different phase and the question is: should I terminate your rights and you heard Miss Ellison testify that you never would admit to your role in the blame; that you considered yourself a victim.

What do you have to say about that?

A.C.: No; it wasn't, it wasn't that I played [the] victim or I blamed everybody else. I honestly didn't feel to a sense that I was hurt, and I was just being judged; and yeah, it was bad. It was awful. It was disgusting when my brother—lifting up of couches;

21

there [were] milk jugs underneath the couch, like little, tiny jugs. It was so bad like it was worse than what the pictures [showed] 'cuz he was just putting stuff underneath the couch like he didn't do anything; no.

THE COURT: We are, I don't know that. [*Sic*.] Now there was a Finding of Neglect. Now, the question is: should we terminate your rights? The question I asked was: Miss Ellison testified that, that you never seem to admit your fault in the situation; and that you were the victim?

A.C.: No; that's not—that's not, I don't feel that way at all. I mean, I admit my faults; but my son is gone. I never had problems; and I did it all by myself with my son for seven years. He's my everything. My home is spotless."

¶ 55    When the court asked about reports that her son did not know how to brush his teeth, A.C. responded that was "not true," and that her son brushed his teeth "every morning and every night. However, when he was taken from her, it was "traumatizing to him" because he had been with her "every day."

¶ 56    After testimony finished, the court recessed until March 9, 2022, for closing arguments. The trial court found A.C. unfit in a ruling described above and proceeded to the best interests hearing, described below.

¶ 57                              B. Best Interests Hearing

¶ 58    The State recalled Smith, one of the caseworkers, who had previously testified at the fitness hearing. Smith testified that D.D. had been placed with his paternal grandparents in June or July 2020 and that Smith had last seen him within the last 30 days. Smith opined that the placement was safe and appropriate for D.D., who had just turned 10 years old and was in the fourth grade and on the honor roll. D.D. was in therapy and had been in therapy since Smith

was assigned the case in December 2020. He was in therapy due to "issues that brought the case in," and Smith stated that it was helpful for him. Smith observed D.D. interact with his grandparents twice a month, and he appeared "comfortable" and "playful" with his grandparents, who had a lot of time to dedicate to hm. D.D. seemed happy in their home. In January 2022, Smith had an opportunity to speak to D.D. alone. At that time, D.D. was opening gifts and "very excited about his gifts," and he told Smith that he liked it there and wanted to stay. Smith did not discuss adoption with him because she felt it was better to leave that topic to his therapist. In February 2022, Smith participated in a meeting and, as a result of that meeting, her agency recommended termination of parental rights and appointment of a guardian who could consent to adoption, with the grandparents providing the contemplated adoptive home.

¶ 59      On cross, Smith testified that, since she was assigned to the case in December 2020, the grandparents had refused all communication with the mother. The grandparents told Smith that they had received a text from A.C. in December 2020 but A.C. denied sending the text. Smith had not seen the alleged text and so had no means of verification. The grandparents did not want to have any contact with A.C. and told Smith that they would not allow D.D. to have any contact with his mother. Since Smith had been the caseworker, A.C. had repeated contact with D.D., but those visits would entirely come to an end if her rights were terminated. Although sometimes D.D. asked to end the virtual visits early, he never said to Smith that he did not want to see his mother, and he participated in the visits.

¶ 60      The next witness was the foster mother and paternal grandmother. When D.D. came into the system, she and her husband had been living in Florida since 2006. They moved back to Illinois in order to care for D.D., and they want to adopt him. The foster mother testified that

D.D. had "a whole village of family members" here, and he visited regularly with his uncles, aunts, and cousins.

¶ 61 After the State and respondent rested, the trial court found it was in D.D.'s best interests to terminate his mother's parental rights, in a two-paragraph ruling which we quoted above. On March 29, 2022, A.C. filed a timely notice of appeal, and this appeal followed. On appeal, the State adopted the Public Guardian's brief.[14]

¶ 62                                ANALYSIS

¶ 63 On appeal, respondent A.C. argues that the trial court's findings are against the manifest weight of the evidence and should be reversed. We examine, first, the trial court's unfitness finding because it serves as the basis for the subsequent best interests ruling. "The bifurcated nature of termination proceedings calls for the court to make a determination regarding the parent's fitness first, without considering the child's best interests or the likelihood of eventual adoption." *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 89.

¶ 64                          I. Standard of Review

¶ 65 The State alleged three separate grounds of unfitness. Although any one ground, if properly proven, is sufficient to support a finding of parental unfitness, the State bears the burden of establishing unfitness by clear and convincing evidence. *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 88. On appeal, the reviewing court considers whether the trial court's "clear and convincing" finding was against the manifest weight of the evidence. *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 88. Findings are against the manifest weight of the evidence when an opposite conclusion is clearly apparent from the record. *McAllister v. Illinois Workers' Compensation Comm'n*, 2020 IL 124848, ¶ 30. Although reviewing courts are reluctant to

_____

[14]As a result, when discussing their collective arguments, we refer to them as "the State."

conclude that a determination is against the manifest weight of the evidence, we will not hesitate to do so when the clearly evident weight of the evidence compels an opposite conclusion. *McAllister*, 2020 IL 124848, ¶ 30.

¶ 66        "Decisions rendered in other cases are of limited assistance" in termination cases, as " '[e]ach case concerning parental unfitness is *sui generis*, unique unto itself.' " *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 88 (quoting *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990)). As a result, factual comparisons to other cases are of little value. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 25.

¶ 67        In the case at bar, the trial court stated that it relied heavily on the testimony of Ellison, the mother's therapist for two months. On appeal, respondent argues that the conclusions of Ellison's phone therapy are not entitled to much weight

¶ 68        Courts have often stated that appellate courts generally owe deference to a trial court's evaluation of evidence because trial courts are in a unique position to observe witnesses' demeanor and hear their tone of voice, in contrast to a reviewing court that has only a cold, lifeless transcript before it. *E.g.*, *People v. Parker*, 2016 IL App (1st) 141597, ¶ 29 (a reviewing court owes deference to a trial court's assessment of a witness' credibility where the trial court is in a superior position to observe the witness' demeanor); *People v. Herman*, 407 Ill. App. 3d 688, 708 (2011) ("we give great deference to the trial court's assessment of the [witnesses'] demeanor"); *Ayers v. Ayers*, 142 Ill. 374, 375 (1892) (*per curiam*) (no certificate of evidence "can reproduce fully and accurately the countenance, tone of voice and manner of the witness while testifying").

¶ 69        However, in an age of distant connections, the question arises: do we owe the same level of deference when a trial court evaluates by Zoom a therapist's assessment by phone?

Respondent argues against placing too much weight on phone therapy, and we have all heard the old adage about "playing telephone." While Zoom is certainly better than a paper record, how many degrees of separation are needed before we, the reviewing courts, adjust our level of deference? *Cf. People v. Shaw*, 2015 IL App (1st) 123157, ¶ 29 ("a trial court does not occupy a position superior to the appellate courts in evaluating evidence that is not live testimony" (citing *People v. Radojcic*, 2013 IL 114197, ¶ 34)); *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009) ("Without having heard live testimony, the trial court was in no superior position than any reviewing court to make findings, and so a more deferential standard of review is not warranted."). However, even applying the manifest weight standard of deference, we find we must reverse.

¶ 70    The evidence cited by the trial court was substantially drawn from the initial reasons for the child's removal from the home, which was principally the unkempt condition of the home itself. In fact, the court stated that this was the "whole" case. However, if this was the whole case, then there would have been no reason for all the proceedings and services that subsequently occurred in the following two years: after all, courts presume that judicial proceedings and required services are not a meaningless exercise. There is no question that A.C. completely turned her life around after her son was removed: she obtained a court order against her brother; she kept her home clean as certified by her town; she found and kept a job; and she located therapy on her own, even after services were cut off, and attended therapy, at least until the day of her testimony.

¶ 71    It is difficult to say that someone is an unfit parent for failing to progress if the recommendations and referrals are confusing, contradictory, and at times unavailable, and the staff in charge of the case cannot agree on the order in which the services should proceed.

Admittedly, these are just overarching observations at this point, but we discuss each of the grounds, separately and in detail, below.

¶ 72                        II. Interest, Concern, and Responsibility

¶ 73        The first alleged ground was Ground B: "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare" 750 ILCS 50/1(D)(b) (West 2020). The disjunctive "or" means that a finding of unfitness may be found based on a failure of any one of the three elements in the list: interest, concern, or responsibility. *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24.

¶ 74        Ground B does not focus on the parent's success but, rather, on the reasonableness of her efforts and takes into account the parent's difficulties and circumstances. *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24; *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1065 (2006). Examples of unfitness under this ground include noncompliance with an existing service plan, a continuing addiction to drugs, a repeated failure to obtain treatment, and infrequent or irregular visitation. *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24; *Daphnie E.*, 368 Ill. App. 3d at 1054, 1065 (unfit under this ground where the mother was infrequent in attending both child visits and outpatient therapy and was noncompliant in taking her prescribed psychotropic medication for schizophrenia).[15] In *Nicholas C.*, for example, the reviewing court found that the trial court's unfitness finding under Ground B was not against the manifest weight, where the mother's urine drops began testing positive again for drugs, where the mother refused to obtain a psychiatric evaluation and was terminated from therapy due to her failure to attend, and where

---

[15]The State argued that "a failure to engage in those [mental health] services, despite visiting, supported a finding of unfitness of ground (b)" in *Daphnie E.*, 368 Ill. App. 3d at 1065-66. Actually, in that case, the schizophrenic mother failed to attend both therapy and visits.

the mother never remedied the risks associated with her living situation. *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 29.

¶ 75    In support of its finding on all three grounds, the trial court cited primarily: (1) the initial conditions of the home which led to D.D.'s removal and (2) A.C.'s "circular thinking," as described by Ellison. However, the trial court did not apportion its findings among the three grounds or address the three grounds separately. As a result, with respect to Ground B, the court did not specify whether it found a lack of interest, concern or responsibility, or all three. In its brief to this court, the State headlined its section on Ground B as A.C. "failed to show responsibility" and focused its arguments on that particular element of Ground B. "Failure to maintain a reasonable degree of *** responsibility as to the child's welfare" (750 ILCS 50/1(D)(b) (West 2020)), by itself, is sufficient to support a finding of unfitness. *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24.

¶ 76    In support of its argument that initial conditions may sustain a trial court's finding under this ground, the State cited *In re J.B.*, 2014 IL App (1st) 140773, ¶ 47. In *J.B.*, the mother severely beat her eight-year-old child, resulting in several fractures, including fractures of his pelvis and femur bones. *J.B.*, 2014 IL App (1st) 140773, ¶¶ 18-21. As the doctor in *J.B.* observed, the femur is a very big bone and needs a substantial impact to break. *J.B.*, 2014 IL App (1st) 140773, ¶ 19. After this beating, the mother was incarcerated, a no-contact order was entered, and DCFS did not provide any services toward reunification. *J.B.*, 2014 IL App (1st) 140773, ¶¶ 4, 47. Based on the beating, the trial court found the mother unfit on several grounds, including depravity. *J.B.*, 2014 IL App (1st) 140773, ¶ 26. This court affirmed the trial court's finding based on the severe beating that brought the child into the system. *J.B.*, 2014 IL App (1st) 140773, ¶ 54 (although this case was respondent's first contact with DCFS,

the trial court's finding was affirmed, where her beating of her eight-year-old son "entailed such force that it broke [his]" femur and pelvis bones).

¶ 77    As the State must realize, the *J.B.* case is to our case like night is from day, and it illustrates the problem with comparing one case to another in this context. In *J.B.*, the mother beat her child severely, the trial court entered a no-contact order, and no services were provided by DCFS toward reunification. *J.B.*, 2014 IL App (1st) 140773, ¶¶ 4, 47.

¶ 78    By contrast, in the case at bar, Dr. Ingram testified that, in her opinion, if A.C. "engage[d] consistently with the therapeutic services recommended," A.C. would be an appropriate parent for D.D. Dr. Ingram gave this opinion, fully aware of the reasons that brought D.D. into the system. Not a single professional who looked at the original conditions found those conditions to be an insurmountable barrier to reunification. Knowing full well what the original conditions were, the social service professionals in this case provided referrals and services toward a goal of reunification. Unless we were to find that all these professionals were completely misguided and their recommended services worthless, we must conclude that a finding of unfitness based on initial conditions is against the manifest weight of the evidence.[16]

¶ 79    In addition to the initial conditions, the trial court also found Ellison's testimony credible and quoted part of Ellison's report, dated October 2, 2020, which stated, "the client's circular thinking showcases an inability to recognize the parental expectations for a healthy, age appropriate development and physical and emotional safety of the client's son."

---

[16]As noted above, the trial court noted, as part of its finding on initial conditions that, "He wasn't potty trained. And within a week or two of being sent to live with his uncle, he accomplished these matters." This finding was contradicted by the testimony of Dolan, the caseworkers' supervisor, who testified at the fitness hearing that a report from D.D.'s therapy indicated that, in November 2020, or almost a year after the case came to DCFS, D.D. continued to wear Pull-Ups and sometimes wet himself during the night.

Immediately after quoting, Ellison, the trial court added, "I find the mother's testimony, again to be indicative of some serious issues. I'm not a therapist. I don't know what they are. But, obviously, they demonstrated themselves in the way her child was living and the way he was acting." At the hearing, Ellison testified that what she meant by "circular thinking was that, instead of accepting accountability" that could lead to progress, A.C. thought "[e]verything is happening to me and we in turn are the victims."

¶ 80     However, the manifest weight of the evidence shows that the minute her son was taken from her, instead of posing like a passive and helpless victim, A.C. acted like the protagonist in her own story and took responsibility to turn her life around. The undisputed testimony showed that (1) she obtained a protective order, the very next day, to get her brother out of the house; (2) she personally went to work cleaning her house, as soon as her brother was out of it, and kept it clean, as certified by her town; (3) she located a job and kept it; (4) she regularly and consistently attended whatever visitation was allowed her; (5) she regularly attended the services for which referrals were made;[17] and (6) after referrals were denied her, she located therapeutic services, including psychiatric therapy as was recommended, on her own and continued with it.

¶ 81     In August 2020, approximately eight months after this case came into the system, Dr. Ingram testified about her observations during an in-person visit between A.C. and D.D.: "[I]t appeared that [A.C.] had a loving and caring relationship with her son, [D.D.]; and it was reciprocated. He was [*sic*], she was attentive to him throughout the observation. They laughed;

[17]Referrals were made only for (1) parenting classes, (2) individual therapy, and (3) the JCAP substance abuse assessment. A.C. completed parenting classes and the JCAP substance abuse assessment and attended individual therapy with Ellison until discharged, when A.C. then sought out and attended further therapy.

they talked during the whole visit that I observed so it was a very positive visit." Dr. Ingram testified that she did not observe any deficits in A.C.'s functioning in August 2020 and that A.C. was responsive to D.D's needs. Dr. Ingram testified that a caseworker, Hull, who had been physically present with D.D. and A.C. in the park, indicated that Dr. Ingram's observations of that visit were consistent with the agency's observations of prior visits. Dr. Ingram testified, while she was doing her assessment, A.C. had three phone sessions with her therapist, Ellison, and Ellison had reported to Dr. Ingram that A.C. was " 'determined' " and " 'extremely committed.' " Dr. Ingram opined that the therapy required "at least six months to eighteen months *** to be effective with people," such as A.C., who "have more than one mental-health diagnosis." When Dr. Ingram completed the parenting capacity assessment for A.C. on September 4, 2020, Dr. Ingram concluded that if A.C. "engage[d] consistently with the therapeutic services recommended," A.C. would be an appropriate parent for D.D. However, on September 29, 2020, after only two months and eight phone calls of therapy, Ellison terminated A.C.'s therapy as unsuccessful. The termination occurred just a few weeks after Dr. Ingram completed the parenting assessment opining that A.C. would be an appropriate parent after completion of services. For her part, Ellison recommended that A.C. complete other services before restarting therapy. However, despite the recommendations of both Dr. Ingram and Ellison, referrals for required services were almost immediately denied.

¶ 82    Courts must consider a parent's efforts in the context of the circumstances in which they occur, including any difficulties that hinder those efforts. *Daphnie E.*, 368 Ill. App. 3d at 1064 (citing *Syck*, 138 Ill. 2d at 278-80 (reversing the trial court's finding of unfitness after considering, among other things, the obstacles that the mother faced, such as the foster parents' refusal to enable contact)). A.C. faced a catch-22—actually, a number of them. For example,

although A.C. regularly attended individual therapy until discharged, no further referral was made during the 2½ months between the discharge and the goal change. Dolan, the caseworkers' supervisor, testified that no further referral was made because the therapist recommended that A.C. engage in domestic violence and substance abuse services first. Dolan acknowledged that Dr. Ingram's report recommended just the opposite: that A.C. engage in individual therapy *before* beginning either domestic violence or substance abuse services.[18] However, Dolan also testified that JCAP had already concluded that substance abuse services were not warranted. Dolan testified that, after VOA recommended a JCAP substance abuse assessment, A.C. completed it and the resulting assessment indicated that A.C. did not warrant and, thus, did not qualify for substance abuse services at that time.

¶ 83        On appeal, the State argues that A.C. was resistant to both drug treatment and domestic violence services. However, A.C. completed the JCAP substance abuse assessment, which concluded that further drug abuse services were not warranted, and VOA refused to issue referrals for either drug or domestic violence services. Dolan testified that the services "recommended for reunification included [1] Domestic Violence Services, [2] a J.C.A.P. Substance Abuse Assessment, and possible follow-up services as needed; [3] Parenting Classes and Coaching, [4] Individual Therapy, and [5] Psychiatric Assessment [6] Parenting Capacity Assessment." Of these services, referrals were made only for (1) parenting classes, (2) individual therapy, and (3) the JCAP substance abuse assessment. A.C. completed parenting classes and the JCAP substance abuse assessment and attended individual therapy until discharged, when she sought and obtained therapy on her own. No referral was made for

_____

[18]On cross, Ellison acknowledged that, in her discharge letter, she recommended that A.C. complete other training, such as domestic violence and drug counseling, before resuming individual therapy. Ellison was not aware, at the time, that this contradicted Dr. Ingram's recommendation regarding the sequence of these services.

domestic violence services because the decision was made to wait until individual therapy was completed, but that never happened. A.C. successfully completed parenting classes but no referral was made for parenting coaching, although required. No referral was made for parental coaching because they were waiting for "input from the Individual Therapist." After Ellison terminated A.C.'s therapy, no further referral was made for individual therapy. Dolan's understanding was that Ellison recommended that A.C. complete domestic violence services and substance abuse services before restarting individual therapy. However, as noted, Dolan testified that no referral for domestic violence services was ever made.

¶ 84    In light of the uncontested evidence that the initial conditions were no longer a barrier to reunification, that A.C. turned her life around when faced with the loss of her son (see *supra* ¶ 80), and that the referrals that she was tasked with following were confusing, contradictory, and often denied, we have no choice but to conclude that the trial court's finding that A.C. failed to maintain reasonable efforts to assume responsibility is against the manifest weight of the evidence. See *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24 (Ground B does not focus on the parent's success but, rather, on the reasonableness of her efforts and takes into account the parent's difficulties and circumstances); 750 ILCS 50/1(D)(b) (West 2020) (the parent must "maintain a reasonable degree of *** responsibility as to the child's welfare").

¶ 85                              III. Reasonable Progress

¶ 86    The second alleged ground was Ground M:

"[f]ailure *** (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child *** during any 9-month period following the adjudication of neglected *** minor *** or (ii) to make reasonable progress toward the return of the

33

child to the parent during any 9-month period following the adjudication." 750 ILCS 50/1(D)(m) (West 2020).

The nine-month period chosen by the State was March 14 to December 24, 2020.[19] We may take judicial notice of the fact that, on March 13, 2020, the President of the United States declared the COVID-19 pandemic to be a national emergency, causing the courts and most service providers to discontinue or curtail the provision of services and contact with the public. See *Notice on the Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic*, The White House (Feb. 18, 2022), https://www.whitehouse.gov/briefing-room/ presidential-actions/2022/02/18/notice-on-the-continuation-of-the-national-emergency- concerning-the-coronavirus-disease-2019-covid-19-pandemic-2/ [https://perma.cc/7K59-TENN] ("On March 13, 2020, by Proclamation 9994, the President declared a national emergency concerning the coronavirus disease 2019 (COVID-19) pandemic."). This most certainly contributed to A.C.'s alleged inability to progress.

¶ 87   Since the trial court did not apportion its findings among the three grounds or address the three grounds separately, the trial court did not specify, with respect to Ground M, whether it found a lack of reasonable efforts or a lack of reasonable progress In its brief to this court, the State headlined its section on Ground M as A.C. "failed to make reasonable progress in services." The State quoted only this element and devoted its arguments to this element.

¶ 88   Our supreme court has defined reasonable progress as " 'demonstrable movement toward the goal of reunification.' " *In re C.N.*, 196 Ill. 2d 181, 211 (2001) (quoting *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000)). "Under the statute's express language, a parent's progress

_____

[19]We note that this period is actually 10 days over nine months. However, this extra 10-day period does not seem to make a difference in the case at bar.

toward this goal is judged under the familiar 'reasonableness' standard." *C.N.*, 196 Ill. 2d at 211. In considering whether reasonable progress has been made, a court may consider both progress with respect to correcting the original conditions and progress with respect to completing the service plan. See *C.N.*, 196 Ill. 2d at 213-14 (rejecting both the view that a court may look for progress only in correcting the original situation and the view that a court may look only to compliance with a service plan).

¶ 89        With respect to a service plan, Ground M provides, in relevant part, that "[i]f a service plan has been established *** and if those services were available, then, for purposes of the Act, 'failure to make reasonable progress ***' includes the parent's failure to substantially fulfill his or her obligations under the service plan." 750 ILCS 50/1(D)(m) (West 2020). Per the express words of the statute, a parent's fulfillment is contingent on the availability of services, and the issue is whether she substantially fulfilled her obligations under the plan. 750 ILCS 50/1(D)(m) (West 2020).

¶ 90        The State stresses, first, A.C.'s discharge from therapy by Ellison. However, individual therapy was just one component of a complex service plan that included a number of recommended services, forms, and assessments, as well as regular visitation. As noted above, A.C. completed the services for which referrals were made,[20] took advantage of whatever visitation was allowed, and attended therapy with Ellison until that was terminated.[21] In light of A.C.'s regular and substantial efforts to comply with the service plan and the visitation that

---

[20]As A.C. argues in her brief, during this same nine-month period, A.C. completed parenting classes in June 2020 and participated in a parenting capacity assessment with Dr. Ingram, which included an over 2-hour interview with A.C. on July 2, 2020, and a 1½-hour parent-child observation in August 2020.
[21]In addition, A.C. sought out another therapist and continued therapy on her own, after Ellison discharged her. However, that occurred outside the nine-month period chosen by the State, which ended on December 24, 2020, and thus we do not consider it here.

it offered, we cannot agree that this discharge was clear and convincing evidence that A.C. failed to substantially fulfill her obligations under the plan. See 750 ILCS 50/1(D)(m) (West 2020). The manifest weight of the evidence establishes reasonable and demonstrable progress with respect to her obligations under the plan. See *C.N.*, 196 Ill. 2d at 211.

¶ 91    In addition, A.C. argues on appeal that the discharge cannot even be considered under this ground, since this ground requires that the service be available and this service was so clearly withdrawn. However, we do not need to reach this question to find that A.C. substantially complied.

¶ 92    The State argues that this case is analogous to *In re C.E.*, 406 Ill. App. 3d 97 (2010). In *C.E.*, a 20-month-old infant was so severely beaten that she had multiple rib fractures, multiple finger fractures, a femur fracture, lower vertebrae fractures, and a spinal cord contusion. *C.E.*, 406 Ill. App. 3d at 98. The trial court found that the infant had been physically abused and tortured. *C.E.*, 406 Ill. App. 3d at 98. Additionally, the mother was convicted of endangering the infant's life by allowing her to be abused and by failing to seek any medical treatment. *C.E.*, 406 Ill. App. 3d at 98. The trial court found the mother unfit on multiple grounds, including Ground M, in that she "demonstrated minimal capacity to internalize the parenting instruction she received." *C.E.*, 406 Ill. App. 3d at 111. A psychologist opined that, as a result of having suffered gross neglect as a child herself, the mother suffered from complex mental health issues, including an attachment disorder. *C.E.*, 406 Ill. App. 3d at 102.

¶ 93    We cannot find "analogous" the severe beating and spinal cord injury in *C.E.*, with A.C.'s unkempt house. In fact, it is difficult to find any part of the *C.E.* facts analogous to the facts at hand. The State argues that the cases are "analogous" because A.C., like the mother in *C.E.*, failed to internalize services, specifically, the therapy that Ellison was providing. Even if

we were to overlook most of the extreme differences in facts between the two cases, we cannot overlook the fact that the mother in *C.E.* had been in individual therapy for several years, as opposed to the two months of individual therapy in the case at bar. See *C.E.*, 406 Ill. App. 3d at 104, 112 (a trauma support specialist worked individually with the mother for two years but "despite several years of therapy" the mother was "incapable of safely and effectively parenting").

¶ 94     The State argues under this ground, as it did under Ground B (*supra* ¶ 84), that A.C. was resistant to domestic violence and substance abuse treatment and that this is evidence of a lack of reasonable progress. As we noted above, A.C. completed the JCAP substance abuse assessment, which concluded that further drug abuse services were not warranted, and VOA refused to issue referrals for either drug or domestic violence services. *Supra* ¶ 83. The State also argues that there is no evidence that A.C. participated in a psychiatric evaluation; however, that assertion overlooks A.C.'s own testimony.

¶ 95     For the foregoing reasons, we find that the manifest weight of the evidence establishes reasonable and demonstrable progress by A.C. in substantially fulfilling the obligations under her service plan.

¶ 96     Although the State does not appear to argue this element of Ground M, we also find that the manifest weight establishes reasonable efforts toward correcting the conditions that led to the child's removal. The undisputed testimony shows that: (1) A.C. obtained a protective order the next day to remove her brother from the house; (2) she cleaned her house and kept it clean, as certified by her town; and (3) she located a job and kept it.

¶ 97                                   IV. Mental Impairment

¶ 98        The third and last alleged ground was Ground P: "[i]nability to discharge parental responsibilities" due to "mental impairment, mental illness or an intellectual disability" or "developmental disability" that "extend[s] beyond a reasonable time period." 750 ILCS 50/1(D)(p) (West 2020). The alleged mental impairment, mental illness, or intellectual or developmental disability must be shown "by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist." 750 ILCS 50/1(D)(p) (West 2020). However, this ground "shall not be construed so as to permit a licensed clinical social worker to conduct any medical diagnosis to determine mental illness or mental impairment." 750 ILCS 50/1(D)(p) (West 2020).

¶ 99        The closest thing to a mental impairment cited by the trial court was Ellison's description of A.C. as having "circular thinking." However, Ellison admitted that this was not a diagnosis or a diagnostic term, and the State does not argue this factor on appeal to support this ground.

¶ 100        The State argues this ground primarily based on A.C.'s prior diagnosis of anorexia and Dr. Ingram's testimony regarding it. However, Dr. Ingram testified that she did not diagnose A.C. with anorexia or make any mental health diagnosis of A.C. Dr. Ingram testified that, according to A.C.'s medical records, A.C. was first diagnosed with anorexia when she was 13 or 14 years old. Dr. Ingram further testified that her review of A.C.'s medical records showed that, although A.C. had been hospitalized several times for anorexia, including in her thirties, A.C. had not been hospitalized or treated for it in over 10 years, and the last time was before D.D. was born.

¶ 101        Neither party disputes that anorexia is a mental impairment or mental illness. As such, a "medical diagnosis" is required "to determine mental illness or mental impairment." 750

38

ILCS 50/1(D)(p) (West 2020). Although evidence under this ground is generally permitted "from a psychiatrist, licensed clinical social worker, or clinical psychologist," social workers are excluded from the diagnosis of mental illness or impairment, thereby requiring a diagnosis from a psychiatrist or clinical psychologist. 750 ILCS 50/1(D)(p) (West 2020). The State, which bears the burden of providing clear and convincing evidence, did not seek a current diagnosis from a psychiatrist or clinical psychologist. Dr. Ingram, who is a clinical psychologist, testified that she did not diagnose A.C. with anorexia or make any mental health diagnosis of A.C.

¶ 102    The State argues that this case is similar to *In re S.K.B.*, 2015 IL App (1st) 151249. In *S.K.B.*, the mother was diagnosed with severe mental health issues while she was in the hospital giving birth, and a DCFS case was opened immediately. *S.K.B.*, 2015 IL App (1st) 151249, ¶ 3. During the pendency of the case, the mother was involuntarily psychiatrically hospitalized three times. *S.K.B.*, 2015 IL App (1st) 151249, ¶ 32. All three clinical psychologists treating the mother opined at the fitness hearing that she was delusional. *S.K.B.*, 2015 IL App (1st) 151249, ¶ 19. The appellate court found that "[t]here was really no dispute that, should [the mother] stop taking her mediation, there would be reason for concern for the well-being" of the child and that she had past inconsistency of remaining medicated. *S.K.B.*, 2015 IL App (1st) 151249, ¶ 31. Unlike the case at bar, there was a diagnosis in *S.K.B.*, provided contemporaneously with the opening of the case and again in the testimony of three separate clinical psychologists at the fitness hearing.

¶ 103    The State argues that the *S.K.B.* case was similar in that "[t]he mother in *S.K.B.* was also fixated on her child's supposed weight problems." However, to suggest or hint that this was a major factor in the trial court's finding in *S.K.B.*, or that the issue there was weight,

misrepresents that case. In *S.K.B.*, the mother accused the foster mother of trying to starve her son, and this accusation came toward the end of a long list of about 20 delusional behaviors, which began with threatening to kill her own mother and accusing her own husband of trying to poison her. *S.K.B.*, 2015 IL App (1st) 151249, ¶ 20.

¶ 104    There is no question that A.C. had food issues. But the question under this ground is whether she had a clinically or medically diagnosed present mental impairment that rendered her unable or unfit to parent her child and which "shall extend" into the future. 750 ILCS 50/1(D)(p) (West 2020). Stewart, one of the case aides, testified that D.D. was "a healthy-sized boy," and there was no testimony or evidence at the hearings that D.D. was too thin or, in any way, nutritionally impaired. In its appellate brief, the State summed up its argument under Ground P by saying: "Based upon [A.C.'s impaired sense of reality through insisting [D.D.] still needs to wear pull ups and by bringing a Pediasure to a visit, the trial court properly relied upon the expert testimony of Dr. Ingram to find [A.C.] unfit under ground p." However, we do not find this argument persuasive. First, the trial court specifically ruled that the one PediaSure was not relevant; second, Dolan's testimony established that D.D. still needed to wear pull ups a year later; and third, Dr. Ingram concluded that A.C. could be an appropriate parent.

¶ 105    First, with respect to the PediaSure incident, Stewart, a VOA case aide, testified that she observed a visit between A.C. and D.D. in a park, where A.C. provided snacks, bottles of water, and one PediaSure. When Stewart later dropped D.D. off at home, the foster parent told Stewart that D.D. was not supposed to have the PediaSure. Respondent's counsel objected to the PediaSure testimony on relevance grounds, and the trial judge agreed. Stating that he did not see the relevance either, the trial judge ruled, "She gave him one bottle of PediaSure; okay. What's the big deal?" The State cannot rely on evidence that the trial court ruled was irrelevant.

Second, as for the pullups, Dolan testified that a report of D.D.'s therapy indicated that, in November 2020, or almost a year after the case came to DCFS, D.D. still needed Pull-Ups.

¶ 106        Lastly, Dr. Ingram testified that she did not observe any deficits in A.C.'s functioning at the time of her observation and that A.C. was appropriately responsive to D.D's needs. Dr. Ingram testified that Hull informed her that her observations were consistent with prior visits, and Dr. Ingram concluded that A.C. could be an appropriate parent.

¶ 107        For all the foregoing reasons, we cannot find that the State provided clear and convincing evidence under this ground.

¶ 108                                CONCLUSION

¶ 109        In short, we find that the trial court's finding that A.C was unfit was against the manifest weight of the evidence, particularly where A.C. made reasonable efforts to assume responsibility, the initial barriers were no longer a barrier to reunification, the evidence established reasonable and demonstrable progress with respect to her obligations under the plan, and Dr. Ingram concluded that A.C. could be an appropriate parent for D.D.

¶ 110        Reversing the finding of unfitness, we remand this case for further proceedings consistent with this opinion.

¶ 111        Reversed and remanded.

¶ 112        JUSTICE WALKER, specially concurring:

¶ 113        I fully concur in the reasoning and results reached by Justice Oden Johnson. I write separately to provide additional support for this court's majority decision to reverse. First, I note that "[i]t is beyond discussion that parents have a fundamental liberty interest in the care, custody, and control of their children." *In re M.M.*, 2016 IL 119932, ¶ 26. The United States Supreme Court recognized:

"[A] natural parent's 'desire for and right to "the companionship, care, custody, and management of his or her children" ' is an interest far more precious than any property right. [Citation.] When the State initiates a parental rights termination proceeding, it seeks not merely to infringe [upon a] fundamental liberty interest, but to end it. 'If the State prevails, it will have worked a unique kind of deprivation… [Hence,] [a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one.' "

*Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982).

¶ 114       A thorough review of the record shows the trial court's findings that respondent did not (1) maintain a reasonable degree of interest, concern, or responsibility as to D.D.'s welfare under section 1(D)(b) (750 ILCS 50/1(D)(b) (West 2020)); (2) make reasonable efforts to correct the conditions that were the basis for D.D.'s removal and/or did not make reasonable progress toward the return of the child under section 1(D)(m) (750 ILCS 50/1(D)(m) (West 2020)); and (3) could not discharge her parental responsibilities due to her mental impairment and/or mental illness under section 1(D)(p) were all against the manifest weight of the evidence (750 ILCS 50/1(D)(p) (West 2020)).

¶ 115       There are several grounds upon which a trial court may find a parent to be unfit. See 750 ILCS 50/1 (West 2020). In this case, the State alleged unfitness based on section 1(D)(b), reasonable degree of interest, concern, or responsibility; section 1(D)(m), reasonable efforts to correct the conditions/reasonable progress toward return of the child; and section 1(D)(p), mental impairment or mental illness. I will address each allegation in turn.

¶ 116       1. Reasonable Degree of Interest, Concern, or Responsibility

¶ 117　　　　　The trial court's finding that respondent did not maintain a reasonable degree of interest, concern, or responsibility as to D.D.'s welfare under section 1(D)(b) was against the manifest weight of the evidence because section 1(D)(b) "does not focus on the parent's success but, rather, the reasonableness of her efforts and takes into account the parent's difficulties and circumstances." *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. "[A] court is to examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 28.

¶ 118　　　　　Here, respondent consistently attended parent/child visits. Dr. Ingram testified that, during the August 2020 visit, respondent and D.D. appeared to have a "loving and caring relationship," respondent "was attentive to him," and "it was a very positive visit." During the November 2020 visits, respondent and D.D. played together and talked about D.D.'s homework and school activities. Dr. Ingram did not observe anything inappropriate or concerning during the visits. Respondent consistently took her prescribed medications to manage her mental illness. She completed parenting classes and a substance abuse assessment. Respondent had other uncompleted recommended services; however, they were not completed because she never received a referral to participate in the services. Respondent was "good about communicating with the caseworker" and rescheduling.

¶ 119　　　　　The evidence shows that respondent was discharged from therapy as "unsuccessful." However, the evidence also provides an explanation for respondent's discharge that is unrelated to her degree of interest, concern, or responsibility. While she did not receive the full series of dialectical behavioral therapy as recommended by Dr. Ingram, she did nonetheless attend alternative therapy. Thus, the circuit court's finding of unfitness under section 1(D)(b) was against the manifest weight of the evidence.

¶ 120    2. Reasonable Efforts to Correct Conditions/Reasonable Progress Toward Return of

Child

¶ 121    The trial court's findings that respondent did not make reasonable efforts to correct the conditions that were the basis for D.D.'s removal and/or did not make reasonable progress toward the return of D.D. under section 1(D)(m) are against the manifest weight of the evidence because respondent showed reasonable progress toward the goal of reunification.

¶ 122    "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001).

¶ 123    According to the State's petition for adjudication of wardship, D.D. was removed from respondent's home because it was uninhabitable, and heroin was found inside the residence (respondent's brother was transported to hospital due to drug overdose). Respondent made reasonable efforts to correct the conditions by (1) presenting a certificate that her home was certified clean and suitable for occupancy and (2) removing her brother, who was a heroin user, from the home and filing a restraining order against him.

¶ 124    Respondent also made reasonable progress toward the return of D.D. by (1) completing her parenting classes; (2) completing a substance abuse assessment; (3) consistently attending parent/child visits; (4) taking her prescribed medications; (5) regularly communicating with caseworkers; and (6) exhibiting care, attention, and concern for D.D. during visits by monitoring D.D.'s food intake and water, ensuring D.D. used hand sanitizer and wore a mask,

engaging in activities with D.D., and showing concern for D.D.'s comfort in the hot weather. See *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000) ("At a minimum, reasonable progress requires measurable or demonstratable movement toward the goal of reunification.").

¶ 125    While there is evidence regarding respondent's inappropriate behavior during her visits, the totality of the evidence largely shows support for her progress. The witnesses testified that respondent's overall behavior was appropriate and that there was no concern. Although D.D. sometimes asked to end the virtual visits early, he never stated that he did not want to see his mother. It was clear that respondent made reasonable progress toward the return of D.D., and therefore, the circuit court's finding of unfitness under section 1(D)(m) was against the manifest weight of the evidence.

¶ 126    3. Mental Impairment or Mental Illness

¶ 127    The trial court's finding that respondent could not discharge her parental responsibilities due to her mental impairment and/or mental illness under section 1(D)(p) was against the manifest weight of the evidence because the evidence lacks sufficient justification to conclude that her inability will extend beyond a reasonable time. "Section 1(D)(p) does not *** allow a finding of unfitness based on a mere showing of mental impairment, illness, or retardation. Rather, the person's mental condition must render him unable to discharge his parental responsibilities and the inability to discharge parental responsibilities must 'extend beyond a reasonable time period.' " *In re R.C.*, 195 Ill. 2d 291, 305 (2001) (quoting 750 ILCS 50/1(D)(p) (West 1994)). Hence, to find a parent unfit on the grounds of mental impairment or mental illness (1) it must be shown by competent evidence that the parent suffers from a mental impairment, illness, or disability that prevents the parent from discharging parental responsibilities, and (2) there must be sufficient justification to conclude that inability will

45

extend beyond a reasonable period. *In re C.M.*, 319 Ill. App. 3d 344, 360 (2001); 750 ILCS 50/1(D)(p) (West 2020).

¶ 128    Generally, courts find sufficient justification where there is conclusive evidence, such as expert testimony, that a respondent's inability will extend beyond a reasonable period. See *C.M.*, 319 Ill. App. 3d at 359-60 (finding sufficient justification where psychologist testified that respondent's personality disorder prevented her from discharging her parental responsibilities and that "this inability extends to the future, 'limiting the likelihood that she would respond to treatment in any reasonable time frame' "); *In re M.M.*, 303 Ill. App. 3d 559, 567 (1999) (finding sufficient justification where psychologist testified that respondent "would never have the capability to be an effective parent"); *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994) (finding sufficient justification where psychiatrist testified that respondent "needs a prolonged course of treatment in the future"); *In re J.A.S.*, 255 Ill. App. 3d 822, 824-25 (1994) (finding sufficient justification where psychologist testified that respondent would be "incapable of assuming a parenting role within the foreseeable future").

¶ 129    Here, the record is devoid of any conclusive evidence that respondent's inabilities will extend beyond a reasonable time. In fact, the record presents the opposite conclusion. Dr. Ingram testified that during the August 2020 visit, she did not observe any deficits in respondent's functioning and respondent was responsive to D.D.'s needs. Further, Dr. Ingram opined that, if respondent "engage[d] consistently with the therapeutic services recommended," she would be an appropriate parent for D.D.

¶ 130    It is true that the evidence need not be absolutely conclusive to satisfy section 1(D)(p). *J.A.S.*, 255 Ill. App. 3d at 824. Nonetheless, given Dr. Ingram's testimony regarding the extent of respondent's mental condition and the effects it had on D.D., it cannot be inferred that she

will have issues parenting beyond a reasonable time. According to Dr. Ingram, respondent would be "an appropriate parent for D.D." with about 6 to 18 months of therapy. Based on the foregoing, the trial court's ruling that respondent was unfit under section 1(D)(p) is against the manifest weight of the evidence because the opposite conclusion is clearly apparent. The judgment of the trial court must be reversed because the State did not establish by clear and convincing evidence that respondent was an unfit parent for D.D. I recognize the emotional and psychological effects on all involved with this matter, but fit, able, and loving "parents have a fundamental liberty interest in the care, custody, and control of their children." *M.M.*, 2016 IL 119932, ¶ 26. This matter must be remanded to the trial court so that a hearing may be held to create a plan for reunification with respondent (D.D.'s biological mother).

¶ 131      PRESIDING JUSTICE MIKVA, dissenting:

¶ 132      The trial court in this case found that A.C. was an unfit parent on three different grounds and terminated her rights on the basis that this was in D.D.'s best interests so that he could be adopted by his foster parents, who were his paternal grandparents. The majority in this case reverses all findings on unfitness and remands this case for further proceedings. I respectfully and strongly disagree.

¶ 133      The standard for our review on the factual findings by the trial court that A.C. was an unfit mother on three different grounds is manifest weight of the evidence. As our supreme court has made clear:

>      "[A] finding of unfitness will not be reversed unless it is against the manifest weight of
> 
>      the evidence *** [because] the trial court's opportunity to view and evaluate the parties
> 
>      *** is superior to that of a reviewing court. [Citation.] A court's decision regarding a
> 
>      parent's fitness is against the manifest weight of the evidence only where the opposite

conclusion is clearly apparent." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21.

¶ 134    I reject the suggestion (see *supra* ¶ 69) that we owe some lesser level of deference because the termination and best interests hearings were on Zoom and the therapy A.C. received was on the telephone. The pandemic has forced the courts and mental health professionals to use different communication tools to avoid in-person contact. I do not agree that the use of these tools impacts our standard of review.

¶ 135    I would also note that in this case, as is common in child protection cases, by the time this judge terminated A.C.'s parental rights on March 9, 2022, he had presided over this case for more than two years, since at least November 26, 2019, when he set a date for the adjudicatory hearing, and had conducted several evidentiary hearings regarding this family. The court also took a recess of several weeks between the end of the evidence presented during the fitness hearing and the argument and ruling so that he could review the voluminous documents in this case. We must defer, as always, to the trial court's factual findings in this case.

¶ 136    I cannot agree that each of the trial court's three findings on unfitness are against the manifest weight of the evidence. I will focus on failure to make progress during the nine-month period of March 14 through December 24, 2020, and inability to discharge parental responsibilities because of a mental impairment. As the statute makes clear, any one ground is a sufficient basis on which to find a parent unfit under the Adoption Act. See *In re C.W.*, 199 Ill. 2d 198, 217 (2002) ("Although the State may rely on several grounds in its petition, a finding adverse to the parent on any *one* ground is sufficient to support a subsequent termination of parental rights."(Emphasis in original.)).

¶ 137    I focus on these two grounds because, in my view, this is where the evidence was strongest. I express no view on the other grounds alleged and suggest that trial courts would aid us in the appellate process if they would explain their findings in more detail than the trial court did in this case.

¶ 138    In reference to ground (m), failure to make reasonable progress, the majority takes issue with the trial court's findings because the court focused heavily on the conditions that D.D. was found to be living in when the case was first filed. In my view, however, this focus was appropriate because A.C. did not make progress on the real problems that brought the case in.

¶ 139    Yes, the house was so dirty that it had been condemned by the City, and eventually A.C. cleaned it, at least to the point it was no longer condemned. Yes, A.C. got a job. Yes, A.C. got an order of protection against her brother who was a heroin user. However, the real issue was that A.C. was not caring for her son in an even minimally satisfactory manner. The dirty house and lack of food were symptoms of her inability to meet his basic needs. In addition to D.D. being in a filthy home, he had missed weeks of school, he was not toilet trained although he was eight years old, and he had not learned to groom himself. There was also evidence that A.C. had taken D.D. to doctors reporting symptoms that did not exist, behaved inappropriately at his school, and appeared oblivious to the fact that her brother, who lived with them, was a heroin addict.

¶ 140    While, as the majority points out, A.C. did engage in some appropriate and loving behavior with D.D. during visits, the caseworkers who observed visits also spoke about some inappropriate behavior that continued into the nine-month period. There was testimony that A.C. gave D.D. PediaSure during one visit—something that she had apparently been asked not to do and suggested her ongoing need to infantilize him. There was also testimony about overly

emotional goodbyes that caseworkers testified left D.D. upset and confused. Caseworkers observed that D.D. appeared uncomfortable with his mother at times and wanted to end visits early. One of the caseworker supervisors testified that, based on her observations, there continued to be "many areas" about the "lack of care for [D.D.]" that A.C. "appeared" not to comprehend. A.C. never progressed to unsupervised visits, which is the natural progression toward overnights and then a return home.

¶ 141        Ms. Ellison, A.C.'s therapist at UCAN, testified explicitly that A.C. made no progress in addressing the baseline reasons that brought the case in. According to the therapist, A.C. expressed the view that she was not at fault for anything that had occurred. In Ms. Ellison's opinion, this made progress in addressing the real problems in the case impossible. According to Ms. Ellison, A.C. engaged in "circular thinking" instead of accepting accountability that could lead to progress. The trial court specifically noted that it found Ms. Ellison very credible.

¶ 142        As the majority points out, A.C. sought and obtained therapy from Dr. Tarawneh. This is certainly evidence of A.C.'s desire to have her son returned home. However, while Dr. Tarawneh testified in a conclusory way that A.C. made "progress" in therapy, the only specifics he could point to were that she found a job and that she was ready to take the next step which he testified was to see a psychiatrist. He had not reviewed the clinic report about A.C.'s mental health issues. Certainly nothing in his testimony supported an argument that A.C. had accepted responsibility for the problems in her mothering of D.D. Moreover, Dr. Tarawneh saw A.C. from March to July 2021, so he had no basis for testifying about her progress during the relevant nine-month period which ended in December 2020.

¶ 143        Even if I were to assume that the testimony of these two treaters—Ms. Ellison and Dr. Tarawneh—created a conflict in the evidence, this is no basis for rejecting the trial court's

conclusion that A.C. failed to make progress. Where, as here, there may be conflicts in the evidence, we defer to the trial court's credibility findings. *In re A.B.*, 308 Ill. App. 3d 227, 240 (1999). As the court noted there, we defer to the trial court "particularly where evidence is in conflict."

¶ 144     There was also ample evidence to support the trial court's finding on ground (p), the inability to discharge parental responsibilities because of a mental impairment. It is clear from the record that the primary source for this finding is the Cook County Juvenile Court Clinic parenting capacity assessment and the testimony of Dr. Ingram, who did that assessment, as well as Ms. Ellison's testimony.

¶ 145     Unfitness under ground (p) requires a finding, by clear and convincing evidence, that a parent has the:

> "Inability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness or an intellectual disability as defined in Section 1-116 of the Mental Health and Developmental Disabilities Code, or developmental disability as defined in Section 1-106 of that Code, and there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period. However, this subdivision (p) shall not be construed so as to permit a licensed clinical social worker to conduct any medical diagnosis to determine mental illness or mental impairment." 750 ILCS 50/1(D)(p) (West 2020).

¶ 146     Although Dr. Ingram noted that A.C. clearly loved her son, the doctor also noted in the clinic report several risk factors that suggested A.C. would not be able to adequately care for, parent, or protect her son. The risk factors included her history of anorexia so severe that at

one point she weighed 74 pounds, the unhealthy boundaries she had displayed with school staff and DCFS workers, and her "inaccurate beliefs" about her son's needs. Dr. Ingram observed in the clinic report that "it is my clinical opinion that [A.C.] continues to present with mental health needs that are not being adequately managed with services." Dr. Ingram testified during the fitness hearing that A.C.'s "unmet mental-health needs included things such as her extreme focus and obsession; her impaired sense of reality; her lack of judgment for certain things; *** and anxiety." Dr. Ingram also opined that those mental health issues impacted her son. According to the clinic report, A.C. "has difficulty applying her parenting knowledge to [D.D.] because of her own mental health needs that need to be addressed." Ms. Ellison's testimony also supported this finding in that she found that A.C.'s "circular thinking showcases an inability to recognize the parental expectations for healthy, age appropriate development, and physical and emotional safety for the client's son." The trial court also had before it A.C.'s extensive hospitalization records, which reflected a lengthy history of mental health concerns.

¶ 147    The majority points out that, under the Adoption Act, the mental illness must be shown by competent evidence from a psychiatrist, a licensed clinical social worker, or clinical psychologist, and the statute does not permit a social worker to provide a medical diagnosis. Dr. Ingram is a licensed clinical psychologist with a Ph.D. Thus, she was certainly competent to testify. The majority also notes that the diagnosis of anorexia was made some time ago and not by Dr. Ingram. Nothing in the statutory language requires that there be a current diagnosis as to a specific mental illness. Rather, the statute requires "sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period." To the extent that the majority suggests there was insufficient evidence that A.C.'s

inability to discharge parental responsibilities would extend beyond a reasonable period of time, I disagree.

¶ 148    Dr. Ingram testified that A.C.'s "symptoms are chronic in nature." Dr. Ingram had reviewed A.C.'s hospitalization records and noted the following:

"Advocate hospital records note a consistent history of [A.C.] being focused and 'obsessed, much like others with an eating disorder diagnosis, with food intake and gastrointestinal issues. During majority of [A.C.'s] hospitalizations, medical staff strongly recommended [A.C.] receive either inpatient psychiatric services or inpatient eating disorder programs, which [A.C.] consistently refused. At the age of 30, [A.C.] weighed 74 pounds and was not eating on her own due to her diagnosis of Anorexia Nervosa.' "

¶ 149    Dr. Ingram's testimony and the record as a whole support the trial court's finding that A.C. was unfit on the basis of ground (p). That finding was not against the manifest weight of the evidence.

¶ 150    The majority does not reach "best interests" because, as it recognizes, this is only relevant if A.C. is unfit. Because I would affirm on unfitness, I would reach the best interests finding. Again, we can overturn only where the trial court's finding that it was in D.D.'s best interests to terminate A.C.'s rights and free him for adoption was against the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 43. There was ample evidence that the paternal grandparents, who had moved to Chicago from Florida to take care of D.D. and hoped to adopt him, would offer him a loving and supportive home. The grandparents were transparent in advising the court that it was not their intent to allow A.C. to have a continued role in her son's life. While I would hope that they would have a change of heart on this issue,

it is surely not a sufficient basis on which to overturn the trial court's finding. I would affirm the trial court's best interests finding, as well.

¶ 151    I dissent.

*In re D.D.*, 2022 IL App (1st) 220410

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-JA-1373; the Hon. Patrick Murphy, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Gina DiVito, Assistant State's Attorney, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, Elise Melrose, of counsel), guardian *ad litem*. |