2025 IL App (1st) 250178

SIXTH DIVISION

December 31, 2025

No. 1-25-0178

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* I.P. and De. P.-W., Minors-Appellees | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
|     Petitioner-Appellee, | ) | |
| v. | ) | |
| | ) | |
| Deric W., | ) | No. 17 JA 839; 19 JA 320 |
| | ) | |
|     Respondent-Appellant.) | ) | Honorable |
| | ) | Diane M. Pezanoski, |
| | ) | Judge, presiding. |

_____

PRESIDING JUSTICE C.A. WALKER delivered the judgment of the court, with opinion.
Justices Hyman and Gamrath concurred in the judgment and opinion.

**OPINION**

¶ 1 Appellant Deric W. appeals from the circuit court's termination of parental rights over his minor children I.P. and De. P.-W, contending the court's finding that he was unfit was against the manifest weight of the evidence. For the reasons below, we affirm.

¶ 2                                    BACKGROUND

¶ 3     On August 23, 2017, the State filed a petition for adjudication of wardship over I.P., who was born on July 2, 2017. In the petition, the State alleged I.P. was neglected due to an injurious environment and drug exposure per section 2-3(1)(b), (c) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b), (c) (West 2016)), and was abused due to facing a substantial risk of injury per section 2-3(2)(ii) (*id.* § 2-3(2)(ii)). Specifically, the State alleged that I.P. "tested positive for illegal substances" at the time of his birth and that his mother, Jessica P., admitted to using drugs and was noncompliant with treatment.[1] DNA testing established Deric's paternity in October 2017 (and the court later entered an order identifying him as I.P.'s father). The court adjudicated I.P. as neglected on May 14, 2018. On August 20, 2018, following a disposition hearing, the court adjudged I.P. a ward of the court and granted the Department of Children and Family Services (DCFS) guardianship with the right of placement. The initial permanency goal was for I.P. to return home within 12 months.

¶ 4     De. P.-W. was born on March 23, 2019, also to Jessica and Deric. On April 3, 2019, the State filed a petition for adjudication of wardship over De. P.-W., alleging the same grounds as for I.P. In support, the State alleged that De. P.-W. also tested positive for illegal substances at birth. The court entered an order establishing Deric's paternity for De. P.-W. on May 28, 2019. On November 20, 2020, the circuit court adjudicated De. P.-W. neglected and adjudged him a ward of the court, giving DCFS the right of placement. The initial permanency goal for De. P.-W was also to return home in 12 months.

¶ 5     On December 17, 2021, the circuit court changed the permanency goal for both I.P. and De. P.-W. to substitute care pending termination of parental rights. The State's supplemental petition

---

[1]Jessica is not a party to this appeal.

for appointment of a guardian with the right to consent to adoption, filed December 8, 2022, listed section 1(D)(b) and (m) of the Adoption Act (750 ILCS 50/1(D)(b), (m) (West 2022)) as grounds for termination ("ground (b)" and "ground (m)," respectively). Regarding I.P., the State alleged six continuous but distinct nine-month periods during which Deric failed to make reasonable progress per ground (m), beginning on May 14, 2018, and ending on November 14, 2022. For De. P.-W., the State alleged three such continuous periods, starting on November 20, 2020, and ending on December 8, 2022.

¶ 6     Deric's fitness hearing began on August 15, 2024. Before testimony began, the State introduced multiple exhibits relevant to this appeal, including DCFS service plans. In the service plan dated February 22, 2018, DCFS noted that Deric had tested positive for cocaine on December 8, 2017, and January 19, 2018. He attended weekly Nurturing Parenting Program (NPP) classes as of January 30, 2018. The July 24, 2018, plan again noted a positive test for cocaine from May 22, 2018. Deric complied with visitation, the NPP classes, and individual therapy but needed progress with his understanding of I.P.'s dietary restrictions.

¶ 7     The June 12, 2019, plan noted Deric was satisfactory with his drug testing, outpatient treatment, individual therapy services, and successfully completed the NPP. Similarly, the August 16, 2019, plan indicated Deric participated in services and was "creating a bond with his infant son." His progress was satisfactory for services including child-parent psychotherapy (CPP), outpatient treatment, drug testing, and individual therapy. The January 31, 2020, and July 31, 2020, plans indicated similar progress in these same services.

¶ 8     The February 9, 2021, plan was similar for most services, though it noted the presence of a dog in Deric's home presented concerns due to I.P.'s allergies. The plan also noted "there are concerns that the parents are not internalizing/accepting the seriousness of the children's needs,"

concerns that were echoed in later plans. The September 2, 2021, plan also noted that Deric missed several virtual medical appointments for his children.

¶ 9     In a transcript from a proceeding on September 17, 2021, also admitted as an exhibit, Deric testified that during a July 2020 visit with his children, bags containing "heroin and some crack" fell out of his pocket.

¶ 10     Finally, the exhibits contained documentation about Deric's other children besides I.P. and De. P.-W. Specifically, Deric fathered a child born in 2013, who was also born drug-exposed, and for whom Deric ultimately had his parental rights terminated after he voluntarily consented to adoption. Additionally, medical records contained in the exhibits showed that on January 27, 2024, a 13-month-old child whom Deric fathered was treated at a hospital for ingestion of cocaine and heroin.

¶ 11     During the fitness hearing, Jasmine Noggins, the DCFS case manager for I.P. and De. P.-W. from September 2018 until May 2020, testified that she recommended a domestic violence service for Deric in 2019 because Jessica reported an incident during her individual therapy and later provided police reports to Noggins. Following a clinical staffing in November 2019, unsupervised visits were not recommended between Deric and his children. Moreover, though the circuit court conditionally granted Deric unsupervised day visits in March 2020 pending a child endangerment risk assessment protocol (CERAP), these visits never occurred because during the CERAP, Noggins discovered that Deric's wife smoked cigarettes inside the home and Deric had a dog to whose hair I.P. would likely be allergic. In addition to the dog hair allergy, Noggins confirmed that I.P. was allergic to nuts and eggs and suffered from asthma. Deric did not ask for updates on I.P.'s health issues. Despite DCFS informing Deric of I.P.'s nut allergy, "During [one] supervised visit, [Deric] had a huge container of peanuts." At no point in Noggins's time on the

case did she recommend unsupervised visits. On cross-examination, Noggins acknowledged that Deric completed the domestic violence service in March 2020.

¶ 12     Kourtney Bledsoe, a child welfare specialist for Little City Foundation (Little City), testified that she worked as a caseworker for I.P and De. P.-W. from May 2020 to January 2021. During her time as caseworker, Deric's drug tests were consistently negative. Bledsoe had concerns with Deric's regular visits with the children, including that visits were never able to occur at Deric's home because of the dog hair and smoking issues. She was also concerned about Deric's ability to appreciate I.P.'s and De. P.-W.'s health concerns, including allergies. Deric would act "flustered" when the children displayed "sensory issues."

¶ 13     Bledsoe recounted an incident on July 15, 2020, during a supervised visit at a park. Xochitl S., I.P. and De. P.-W.'s foster mother, was also present. At some point, Xochitl approached Bledsoe and handed her multiple baggies, some of which contained pills, and others a white substance. Bledsoe confronted Deric, who admitted the baggies belonged to him and contained his "medication." On cross-examination, Bledsoe testified that she considered I.P. "exposed" to the substances in the baggies because he "picked [them] up and gave [them] to [Xochitl]." Bledsoe did not test the substances in the baggies.

¶ 14     Xochitl testified that in the July 15, 2020, incident, I.P. "picked up the bag and handed it to me and said 'look, mom, candy.' " Xochitl took the bag and immediately gave it to Bledsoe. She also recounted an incident when I.P. went into anaphylactic shock when exposed to peanut butter. Both I.P. and De. P.-W. had visited the emergency room in the past for asthma attacks.

¶ 15     Toni Diaz, the current caseworker from Little City who had worked on I.P.'s and De. P.-W.'s case from January 2021, testified that she did not receive information that Deric successfully completed individual therapy or CPP services during her time on the case. After the permanency

goal changed in December 2021 and Little City was no longer responsible to pay for services, Diaz never received information from Deric that he completed any services on his own.

¶ 16   Deric did not have unsupervised visits with I.P. and De. P-W. in his home while Diaz was the caseworker. Following a CERAP on September 28, 2021, Diaz noted Deric's house still smelled like smoke and still contained dog hair, and the home was again not deemed safe for visitation. Additionally, Diaz had concerns about Deric's parenting based on her observations during supervised visits, including that he supplied inappropriate food during visits. She noted an incident where Deric asked if he could give the children fish sticks despite having been previously informed that I.P. was allergic to fish. Diaz also had concerns about Deric's ability to comfort the children, noting, "There would be times where the kids would kind of be agitated and it appeared like instead of kind of consoling them, it would be like more of a mocking them situation."

¶ 17   On cross-examination, Diaz acknowledged she rated Deric's progress in services as satisfactory in multiple service plans.

¶ 18   Testimony for the fitness stage concluded, and following argument, the circuit court found Deric unfit on both grounds (b) and (m). In so finding, the court cited the July 15, 2020, incident, Deric's inability to appreciate the risk of I.P.'s allergies or correct conditions in the home to allow for unsupervised visitation, his continued relationships with women that abused drugs or smoked cigarettes in the home, and the incident with his 13-month-old son in January 2024.

¶ 19   The matter moved to the best interest phase where, after additional testimony, the circuit court terminated Deric's parental rights after finding adoption was in both I.P.'s and De. P.-W.'s best interests. This appeal followed.

¶ 20                                  JURISDICTION

¶ 21   The circuit court terminated Deric's parental rights on January 31, 2025, and he filed his notice of appeal that same day, giving this court jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017).

¶ 22                               ANALYSIS

¶ 23   On appeal, Deric challenges only the circuit court's fitness finding, contending that the State did not establish his lack of fitness on either ground (b) or ground (m) by clear and convincing evidence.

¶ 24   The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)) govern the involuntary termination of parental rights in Illinois. Termination, per the Juvenile Court Act, involves a two-step process. *In re M.I.*, 2016 IL 120232, ¶ 20. In the first step (the only step at issue in this appeal), the State must demonstrate that the parent is "unfit" by clear and convincing evidence under criteria provided by the Adoption Act. *Id.* The circuit court's fitness determination is reviewed under the manifest weight of the evidence standard. *Id.* ¶ 21. A reviewing court using this standard of review will not reverse unless the "opposite conclusion is apparent from the record or the decision is unreasonable, arbitrary, or based on something outside of the record." *In re L.G.*, 2025 IL App (1st) 241464, ¶ 28.

¶ 25   The circuit court found that the State established Deric was unfit based on two distinct grounds from the Adoption Act: ground (b), in that Deric failed to (1) maintain "a reasonable degree of interest, concern or responsibility" as to I.P. and De. P.-W.'s welfare; and ground (m), in that he failed to (2) "make reasonable progress toward the return of [I.P. and De. P.-W.] during any 9-month period." 750 ILCS 50/1(D)(b); (m)(ii) (West 2022). When the lower court finds a

parent unfit on multiple grounds, the reviewing court will affirm that decision provided the record supports any one ground for termination. See *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006).

¶ 26    We first analyze whether the State provided clear and convincing evidence on ground (b). Regarding ground (b), Illinois courts have explained that the three elements of interest, concern, and responsibility are disjunctive, meaning a circuit court may find termination appropriate if the State demonstrates the parent failed to maintain any one of them. *In re D.D.*, 2022 IL App (1st) 220410, ¶ 73. On the responsibility element, the court may find that it is not enough for a parent to demonstrate responsibility simply by complying with services or showing some interest. *L.G.*, 2025 IL App (1st) 241464, ¶ 30 (citing *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶¶ 29-30).

¶ 27    We find the circuit court's ruling that Deric was unfit per ground (b) was not against the manifest weight of the evidence and affirm on this basis. As such, we do not reach ground (m). *Donald A.G.*, 221 Ill. 2d at 244. The record shows that both I.P. and De. P.-W. entered DCFS care because of drug exposure at birth. Thus, the very root of Deric's need to engage with services respecting his fatherhood of I.P. and De. P.-W. was the risk inherent in exposing his children to the presence of drugs. Despite this, the record further shows Deric never took the required steps to distance himself, or shield his children, from controlled substances. First, Deric tested positive for cocaine in 2017 and 2018. Then, though the positive tests stopped, there was the disturbing incident in July 2020 where I.P. picked up baggies apparently containing both cocaine and heroin that belonged to Deric. Thankfully for everyone involved, I.P. decided to give that bag to his foster mother. But for Deric to have those substances around him or his children in any capacity, let alone *during a supervised visit*, provides as clear and convincing a basis as this court can conceive for the circuit court to conclude he failed to maintain a reasonable degree of responsibility respecting his children's welfare such that they could be safely returned to his custody.

¶ 28    Sadly, this was not the last documented incident involving Deric and controlled substances. In 2024, seven years after I.P. was born drug-exposed, and five years after De. P.-W. was born under the same regrettable circumstance, with both having been in DCFS care since birth, Deric's 13-month-old child presented to the emergency room after ingesting cocaine and heroin. Again, for such substances to be anywhere near Deric, let alone his children, at that point in time constitutes clear and convincing evidence that he never demonstrated the level of responsibility necessary for the lower court to conclude he was fit for his children to return home. See *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 30. Based on the above, the court's finding was reasonable and supported by the record, and we will not disturb it on this manifest weight of the evidence review. *L.G.*, 2025 IL App (1st) 241464, ¶ 28.

¶ 29    While Deric's conduct surrounding controlled substances is sufficient on its own to justify the circuit court's fitness determination, it is also worth noting that the record further supports this conclusion based on Deric's repeated failures to appreciate and act upon his children's health concerns—specifically I.P.'s food and dog hair allergies and both children's asthma issues. Deric did not correct the presence of smoke and dog hair in his home despite repeated warnings and continued to expose I.P. to nuts and fish despite being informed of his allergies. It would have been reasonable for the court to conclude based on this conduct that Deric refused to take the necessary steps to ensure a safe home environment for his children should they be returned home, further demonstrating his continual failure to maintain a reasonable degree of responsibility towards their welfare.

¶ 30    Deric argues that his participation in services was strong enough to counteract these concerns and render the court's decision contrary to the manifest weight of the evidence. In so arguing, he points to his compliance with recommended services and his years of clean drug tests

as showing his conduct was reasonable, which he contends is the crucial consideration for ground (b). See *In re Adoption of Syck*, 138 Ill. 2d 255, 278-79 (1990). This argument fails because while Deric did act reasonably in certain respects, the record supports the conclusion that he failed to maintain a reasonable degree of responsibility regarding perhaps the most central issue: protecting his children's welfare by shielding them from harmful exposure to controlled substances. We do not find that Deric's participation in drug treatment services and his clean drug tests are irrelevant; indeed, it is well-established that service completion and satisfactory ratings in a DCFS service plan are factors for the circuit court to consider. See *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1065 (2006). But they are not conclusive factors and given the seriousness of Deric's repeated instances of exposing his children to drugs, it was not against the manifest weight of the evidence for the circuit court here to conclude that his compliance with some services and improvement in some areas did not override the drug issues. See *In re S.K.B.*, 2015 IL App (1st) 151249, ¶¶ 32-33 (explaining that where the record contained evidence supporting both a finding of fitness and unfitness, the issue was "particularly suited to be resolved" by the circuit court). It follows that the record supports the court's conclusion, even where the record contained some evidence supporting Deric's position.

Finally, Deric argues that his lack of understanding of the children's medical needs was due to insufficient assistance from DCFS, not his own unreasonable conduct. First, countering the State's evidence about Deric's conduct in this area would not address the controlled substance issue. Second, this argument fails because the statutory standard is whether Deric maintained a reasonable degree of responsibility, and it was not against the manifest weight of the evidence for the circuit court to conclude that Deric's repeated failure to account for I.P. and De. P.-W.'s medical needs was unreasonable. See Daphnie E., 368 Ill. App. 3d at 1065-66 (The court rejected

the argument that DCFS's failure to provide certain assistance to the defendant provided a basis to reverse a finding of unfitness on ground (b) where defendant still had the ability to "comply with service plan directives."). Regardless of the services DCFS did or did not offer, the record conclusively shows Deric knew I.P. had food and dog allergies and both children had asthma. But Deric continued to offer I.P. food to which he was allergic and failed to remove the dog hair or cigarette smoke from his home.

¶ 31

¶ 32                                             CONCLUSION

¶ 33    The record supported the conclusion that Deric did not maintain a reasonable degree of responsibility as to I.P.'s or De. P.-W.'s welfare. Accordingly, we affirm the circuit court's finding that he was unfit as a parent.

¶ 34    Affirmed.

***In re I.P.*, 2025 IL App (1st) 250178**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 17-JA-839, 19-JA-320; the Hon. Diane M. Pezanoski, Judge, presiding. |
| **Attorneys for Appellant:** | Gillian Fealy, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak and Gina DiVito, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, Carrie Fung, and Cristina Rizen, of counsel), for appellee. |