2026 IL App (1st) 251111-U

FIFTH DIVISION
January 16, 2026

No. 1-25-1111

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| *In re* J.B., a Minor, | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2023 JA 00168 |
| | ) | |
| K.S. and R.B., | ) | Honorable |
| | ) | Patrick T. Murphy, |
| Respondents | ) | Judge Presiding. |
| | ) | |
| (R.B., Respondent-Appellant)). | ) | |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Mitchell and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court's order terminating the parental rights of the father in this case is affirmed. The record reflects no legal error, and neither the court's finding of unfitness based on a lengthy period without visitation nor its finding that termination was in the minor's best interest was against the manifest weight of the evidence.

¶ 2    The respondent-appellant in this case, R.B., appeals from the termination of his parental rights to J.B., his two-year-old biological daughter. J.B.'s biological mother, K.S., whose parental

rights were also terminated, is not a party to this appeal.

¶ 3    The trial court found R.B. unfit to parent J.B. based on his "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare" (750 ILCS 50/1(D)(b) (West 2024). R.B. argues on appeal that the court erred as a matter of law, believing it was required to make this finding, regardless of the extenuating circumstances that had prevented him from regularly visiting J.B. for most of her life. He insists that, when properly considered, those circumstances preclude a finding of unfitness.

¶ 4    R.B. also challenges the trial court's finding that a termination of parental rights was in J.B.'s best interest, arguing that the court did not reference the statutory best interest factors, gave insufficient weight to the effect of termination on J.B.'s ability to know her biological family, and improperly referred to the personal circumstances of the judge's own family.

¶ 5    Although the record reflects that R.B. made significant efforts at times to see his daughter and to do some of the services suggested, and although we agree with the trial court's concerns about some of the lapses in the agency's efforts, we also agree with the court that the State carried its burden of proving both unfitness and that it was in J.B.'s best interests to terminate R.B.'s rights.

¶ 6                                    I. BACKGROUND

¶ 7                                    A. Initial Proceedings

¶ 8    J.B. (initially identified in the record as J.S.) was born on February 25, 2023, and taken into protective custody on March 2, 2023. The State alleged, in its petition to adjudge her a ward of the State, that J.B. was neglected, pursuant to section 2-3(1) of the Juvenile Court Act (Act), because her environment was injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2022)) and because she had tested positive for a controlled substance at birth (*id.* § 2-3(1)(c)). The State further

alleged that J.B. was abused, pursuant to section 2-3(2)(ii) of the Act, because a person responsible for her welfare had created a substantial risk of serious physical injury to her by other than accidental means (*id.* § 2-3(2)(ii)). The State asserted that K.S. had five other children in DCFS custody, that she was noncompliant with services, and that both she and J.B. had tested positive for illegal substances at the time of J.B.'s birth. The trial court found probable cause existed to support the requested findings and awarded temporary custody of J.B. to the Department of Children and Family Services (DCFS), with the right to place her in foster care.

¶ 9 Following an adjudication hearing on June 20, 2023, the trial court found that J.B. was both neglected based on an injurious environment (*id.* § 2-3(1)(b)) and abused based on a substantial risk of serious injury (*id.* § 2-3(2)(ii)). The court noted in its order that no one had appeared at the hearing on behalf of DCFS. It further noted that although R.B. had submitted to DNA testing shortly after this case was initiated, DCFS had failed to have J.B. tested, despite repeated requests to do so by both the court and the State's Attorney. The court admonished the agency, stating: "Over the past month DCFS workers have routinely appeared late for trials or as in the present case, not at all. This is unacceptable. Further, the fact that DCFS has had over three months to test the child but ha[s] thus far refused to do so is equally unacceptable." It ordered the agency to promptly have J.B. tested so that paternity could be established.

¶ 10 On September 22, 2023, the court found, based on DNA evidence, that R.B. was J.B.'s biological father. Following a disposition hearing held that same day, it adjudged J.B. a ward of the court and found, pursuant to section 2-27 of the Act (705 ILCS 405/2-27(1) (West 2022)), that both parents were unable, for other than financial circumstances alone, to care for J.B. and that reasonable efforts made to avoid that result had been unsuccessful. The court appointed the DCFS Guardianship Administrator as J.B.'s guardian, with the right to place her.

¶ 11    Over one year later, on November 25, 2024, R.B.'s appointed counsel moved to withdraw. Counsel represented that he had diligently undertaken to represent R.B. in this matter but had been "unable to secure any contact with him for a lengthy period of time, over six months." According to the attorney, R.B. had "failed to be assessed for reunification services, failed to participate in visits, and failed to appear in Court[,] making further fruitful representation impossible." The court granted the motion on January 22, 2025.

¶ 12    That same day, the State moved to permanently terminate the parental rights of both K.S. and R.B., pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)) and section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29) (West 2024)). The State asserted that K.S. and R.B. were unfit to parent J.B. because they had each "[f]ail[ed] to maintain a reasonable degree of interest, concern or responsibility as to [J.B.'s] welfare" (*id.* § 1(D)(b)) and failed, within two separate nine-month periods following the court's findings of neglect and abuse (June 20, 2023, through March 20, 2024, and March 17, 2024, through December 17, 2024) to make reasonable efforts to correct the conditions that were the basis for J.B.'s removal (id. § 1(D)(m)). As to R.B., the State additionally asserted abandonment (*id.* § 1(D)(a)), desertion (id. § 1(D)(c)), and an evidenced intent to forego parental rights (*id.* § 1(D)(n)) as grounds for a finding of unfitness. It noted that J.B. had resided in her foster parent's home since March 2023, the foster parent wished to adopt her, and the State believed that was in J.B.'s best interest.

¶ 13                             B. Termination Hearing – Unfitness

¶ 14    The unfitness portion of the hearing held on the State's petition took place on April 11, 2025. R.B., again represented by counsel, was present, and the State began by voluntarily dismissing its allegations that he was unfit based on abandonment and desertion.

¶ 15    The State first called J.B.'s foster parent, Ebony Taylor. Ms. Taylor testified that she was

unrelated to J.B.'s natural parents, but that J.B. had been in her care since March 22, 2023, when she was less than a week old. K.S. had not had contact with J.B. since June 2023, and R.B. had not had contact with her since September 2023. Ms. Taylor's contact information was on file with the agency and had never changed. Weekly visits were initially scheduled through the agency but, according to Ms. Taylor, they were inconsistent and eventually lapsed. Ms. Taylor was not sure what happened but believed that the parents were not in contact, and the agency had a difficult time reaching them.

¶ 16    The State next called Valencia Randolph, program director at Little City Foundation, a non-profit organization that works with DCFS to provide support for children in state care. Ms. Randoph testified that she supervised several of the caseworkers who had at one time or another been assigned to J.B.'s case, including Rania Arar, Crystal Moreland, Kierstan Holmes, and Tiffany Blanks. At no time had unsupervised visits been recommended, for either parent, due to a lack of progress in recommended services. It was Ms. Randolph's recollection that R.B. had been referred to parenting classes, an alcohol and drug assessment, individual therapy, a domestic violence assessment, random urine screens, and weekly supervised visitation. Ms. Randolph did not believe he had completed any of those services. He was initially "somewhat consistent" with his weekly visitation, and those visits were always appropriate, but his visits stopped when he became incarcerated.

¶ 17    Rania Arar testified that she was J.B.'s first caseworker, from April 2023 until September 2023. She communicated with K.S., referred her to services, and supervised one visit at the juvenile court between K.S. and all of her children shortly after J.B. was born. Ms. Arar stated that K.S. completed her domestic violence class and began but did not complete a parenting class. She was referred to but did not attend a psychiatric assessment.

¶ 18    R.B. visited J.B. regularly during the time that Ms. Arar was assigned to the case, and his visits were always appropriate. He cooperated with and was accessible to her. She spoke to him about the reunification services he would need to complete, and he agreed to engage with those services. When asked if he followed through, Ms. Arar could not say, as she had been reassigned. She remembered her supervisor at the time only as "Dona." On cross-examination, Ms. Arar acknowledged that R.B. had completed a drug and alcohol treatment program but stated that she had not communicated directly with him regarding the parenting class, leaving that to the parenting agency, and was later reassigned.

¶ 19    Kierstan Holmes testified that she was J.B.'s caseworker for just two weeks in the spring of 2024. She had two telephone conversations with K.S. during that time but did not make any specific referrals for services and was ultimately reassigned to J.B.'s three oldest siblings.

¶ 20    Ms. Holmes met with R.B. once, in a hallway at the courthouse sometime in April 2024. Her supervisor at the time, Jacklyon Philips, was there, and R.B. was speaking to her about the services he needed to complete. He expressed to them both that "he wanted to do more visits with his daughter" and, according to Ms. Holmes, they were "pretty much about to get that set up." R.B. called her the next week, "still want[ing] to know the updates of him doing services for his daughter." She told him that they "were moving forward of getting that done" but explained that she was no longer J.B.'s caseworker, and she did not yet have the new caseworker's information. Ms. Holmes could not recall what she told R.B. about services. She agreed on cross-examination that the new caseworker, to whom she provided his contact information, "never specifically referred him to any services."

¶ 21    Deneve Carter testified that she was the foster adoption supervisor at Little City Foundation and had supervised J.B.'s current caseworker, Tiffany Blanks, since August 2024. Ms. Carter

stated that it was never recommended during that time that either parent have unsupervised contact with J.B. She explained that K.S.'s whereabouts were initially unknown, she did not engage in recommended services, and she had tested positive for phencyclidine (PCP) in November 2024. Although she was referred for a number of services, communication with her was inconsistent. She completed an initial assessment but did not follow through with any of the recommendations.

¶ 22    As to R.B., Ms. Carter said, "We had no contact. We did not know where he was." The agency did random jail checks to try to locate him, but without success. Reunification services for him included domestic violence and substance abuse assessments, parenting training, individual therapy, and random drug testing. Referrals were not formally made for those services, however, because R.B. "was not able to be reached upon being in contact." When asked, on cross-examination, if she was aware of R.B.'s home address on South Sangamon Street, Ms. Carter said, "I believe we were aware when Tiffany [the caseworker] came to court. Then we did Diligent Searches." Ms. Carter stated that notices were sent to that address as well as to the Illinois Department of Corrections and the Cook County Jail.

¶ 23    Tiffany Blanks, J.B.'s caseworker at the time of the hearing, testified that K.S. had completed a substance abuse assessment but failed to engage in treatment and did not return the agency's calls or emails. Ms. Blanks called K.S. in November 2024, when K.S. tested positive for PCP following a random urine drop. K.S. denied using PCP and insisted the results were wrong. Ms. Blanks explained to the court that K.S. was eligible for supervised visits with J.B., but only if she could prove her sobriety with a clean urine drop. Ms. Blanks would inform K.S. where to go for the random urine drops and provide her with bus fare, but K.S. did not submit to any further testing and did not inquire about visiting J.B. Ms. Blanks's last communication with K.S. was in January 2025, when K.S. texted to tell her "she was not going to do any more services; and to tell

the Judge that."

¶ 24    Ms. Blanks reached out to the last phone number in the file for R.B. but did not hear back. She attempted to contact R.B. at the contact information that was supplied to her by his attorney, but with no success. Her only contact with R.B. was at an October 2024 videoconference court hearing where they were placed together in a breakout room. Her phone died before she was able to speak to him, however, and she was later unable to reach him. Ms. Blanks said she had no reason to believe that R.B. was incarcerated. He appeared at that time in "some kind of home setting." She nevertheless did a jail check in November and December of 2024, but again did not locate him. In the past three months, Ms. Blanks had done two more diligent searches, reached out to R.B.'s attorney, and emailed the email address and called the phone number that she had been provided for him. She did not learn until the last court hearing, on March 26, 2025, that R.B. was incarcerated, and she had no idea when he had been arrested. R.B. had not had any contact with J.B. during the entire time that Ms. Blanks had been assigned to the case.

¶ 25    The State introduced the following documentary evidence, which primarily related to its allegations of K.S.'s unfitness: (1) J.B's February 25, 2023, birth certificate and hospital paperwork related to her birth; (2) an integrated assessment completed for one of K.S.'s other children, dated May 11, 2022; (3) service plans for K.S. and her children dated August 2023, February 2024, and August 2024; (4) filings and orders from proceedings relating to K.S.'s other children; and (5) the results of a drug test, dated December 3, 2024, indicating that K.S. tested positive for PCP.

¶ 26    Both the State and K.S. then rested, as to unfitness.

¶ 27    R.B. then took the stand. He testified that he was 27 years old and had been in jail, on a charge of possession of cannabis, since January 1, 2025, but believed he would soon be released

pending trial. R.B. confirmed that he had regularly visited J.B. from April to September of 2023. He was referred for an alcohol and drug assessment, which he attended, at Health Care Alternatives. This was a two-month long, twice-weekly class that met in the evening for a few hours each session. R.B. submitted to drug testing while attending that class and never tested positive. He also successfully completed a one-month long, twice-weekly parenting class with an organization called A Knock at Midnight in April and May of 2024. R.B. testified that he had no other children and that he found the class helpful and enjoyed it. It taught him "the different ways to connect and bond with [J.B.]" and "the different ways to discipline [a] child."

¶ 28     When asked why he stopped visiting J.B. in September 2023, R.B. explained that his apartment had caught on fire and he had lost all of his paperwork, including his lawyer's contact information. He was unable to make contact with K.S. until, in April 2024, he finally reached her and she provided him with the contact information for Ms. Holmes. When he reached out to Ms. Holmes about restarting his visits with J.B., however, he received no callback. He went to the Little City Foundation on five or six occasions to try to speak with someone in person, but he could not gain access to the building without a password. Not wanting to cause a disturbance, he would just wait outside the gate. He left numerous voicemails, but no one called him back, so he finished the parenting class on his own.

¶ 29     R.B. testified that he had graduated from high school and had family who lived in the area. He had his own apartment and had worked as a forklift driver at Target for almost a year-and-a-half, a position he believed would still be available to him when he was released from jail. R.B. told the court that he "would really, really love to be involved in [his] daughter's life again."

¶ 30     On cross-examination, R.B. acknowledged that the charge for which he was awaiting trial was for the possession of methamphetamines as well as cannabis, and that it was a felony offense.

He agreed that from 2023 to 2025 he had been arrested three other times (though he explained that one of those arrests was for the same case) and had lived at three or more addresses. When asked if he thought he could have done more to contact the Little City Foundation and to see J.B., R.B. said, "I have done as much as I can; I believe."

¶ 31    R.B. submitted a single exhibit, an October 23, 2023, integrated assessment report summarizing his initial parenting assessment interview on June 20, 2023. R.B. told the interviewer at that time that he had had a good childhood. He was raised by his parents, who were still married, and had five siblings, though he had lived for a time with his grandparents and aunt. He played sports, was on the honor roll, and was never involved with the child welfare system. After graduating from high school, he got a job at Amazon and moved in with his partner. They had a son who was born with health problems and who passed away after spending a year in the hospital. R.B. met J.B.'s mother, K.S. at a restaurant, and they dated for a while, but their relationship ended due to K.S. "doing things he did not agree with." At the time of the interview, R.B. was in a new relationship, one he described as "good, positive and supportive," and lived with his partner and her two children, ages 11 and 9.

¶ 32    R.B. denied any history of domestic violence or mental health problems. He was charged with possession of a stolen vehicle in 2017 and possession of cocaine and cannabis in 2021, receiving probation both times. He had previously used marijuana and ecstasy but had been "clean" for four years. He identified as an alcoholic but explained that he had changed his drinking habits after completing an outpatient program in September 2022 as a condition of his probation. R.B. worked full-time at a Target distribution facility and hoped to obtain his commercial driver's license. He shared household expenses with his partner, and believed that he was financially able to care for J.B. His "biggest goal [was] to gain custody of his daughter" and to "continue to work

on himself."

¶ 33    The interviewer concluded by noting that R.B. "presented with a number of strengths." He "appeared openly engaged," understood areas where he needed to improve, and "appear[ed] to understand the impact his actions [could] have on others, primarily his daughter should he gain custody of her." He downplayed his involvement with drugs and alcohol, however, something the interviewer believed "require[ed] ongoing observation." It was recommended that he participate in individual therapy, parenting education, parent coaching, and a substance abuse assessment.

¶ 34    R.B. then rested.

¶ 35    The State argued that it "strain[ed] credibility" that R.B. "could not at least [have] gotten on the phone with someone" to explain that he wanted to restart visitation with J.B., insisting that he "just [was] not credible on that point." It argued that K.S. similarly knew "full well" how to contact J.B.'s caseworker, and there had been "no demonstrable movement towards return home." K.S. had been found unfit with respect to another one of her children "for similar reasons."

¶ 36    Counsel for K.S. noted that, as detailed in the State's documentary exhibits, she had "lived and experienced a horrific life," as  both as a child and as a young adult, and pointed out that she had engaged in at least some services.

¶ 37    Counsel for R.B. argued that the State had not met its burden of proving his unfitness by clear and convincing evidence. The integrated documents the State had submitted for the most part did not even mention R.B. The caseworker witnesses had each testified that someone else at the Little Village Foundation had made the actual referrals, but there was nothing at all in writing that established that. Counsel argued that five caseworkers was "way too many" for a case that was barely two years old, and that consistency in any services was impossible with that sort of turnaround. R.B. had fallen on hard times, counsel argued, but prior to that he had been engaged

in the care of his daughter. He came from "a good background, a good home, a good education." He was young, was turning his life around, and had "testified very honestly and frankly that he want[ed] to be a part of his child's life."

¶ 38   At this point, as to R.B., the State voluntarily dismissed its requests for an unfitness finding under anything other than ground (b) of the Adoption Act.

¶ 39   The court began by noting that unfitness findings were the most difficult to make, because the court was "dealing with an innocent child on one hand" and on the other parents who "for the most are not bad people" but rather "overwhelmed people without much in the way of support and assets." J.B. had come into the system as a newborn 26 months earlier. K.S. had visited for the first few months, and R.B. had visited for six months, but then those visits had dropped off. The court agreed "that the agency with all the workers and everything could have done better," but did not feel it was the agency's responsibility "to continue to go out and find the parents and drag them in and say, 'Listen, we want you to visit. We want you to be in services.' " The court noted that there was a formal progression of visitation: supervised visits once a week, then twice a week, then unsupervised visits, and then the child returns home. "[I]n this case it didn't happen," the court said, "so I believe the law mandates that I must make a Finding of Unfitness by clear and convincing evidence." The court believed R.B. "to be a decent young man probably overwhelmed and facing a lot of challenges," but there were good reasons that "the law require[d] him to maintain contact," and he had not done so.

¶ 40   The court found by clear and convincing evidence that both parents were unfit pursuant to ground (b) (failure to make reasonable efforts) and that K.S. was additionally unfit pursuant ground (m) (abandonment).

¶ 41              C. Termination Hearing – Best Interest of the Child

¶ 42    The best interest portion of the termination hearing was held on May 14, 2025.

¶ 43    The State first recalled Ms. Taylor, J.B.'s foster parent, who testified that she had continuously cared for J.B. for over two years, since just after the child was born, and hoped to adopt her. Ms. Taylor was unmarried, living with her 22-year-old son, and had become a foster parent because she wanted to "to provide a sense of love and stability to a child that needed it." Adoption would allow her to provide J.B. "consistency, love, stability, and a place she c[ould] call home," so that she always had somewhere to go. J.B. had become a part of Ms. Taylor's family, was included in everything they did, and was thriving. She attended daycare, received speech services and occupational therapy, was up to date with her immunizations, and called Ms. Taylor "mom" or "mommy." Ms. Taylor planned "family days" for the three of them, in which they went to the aquarium or the park or had family cookouts. She arranged playdates for J.B. with other children in the neighborhood, and was involved in activities organized by the daycare, including fundraisers, carnivals, and a father-daughter dance that Ms. Taylor's son attended with J.B.

¶ 44    On cross-examination by R.B.'s counsel, Ms. Taylor stated that she did not "have anything against" J.B. having a relationship with her biological parents, that that was indeed something she had "welcomed from the beginning." She was primarily concerned with J.B.'s safety and for there to be consistency with respect to who was involved in her life.

¶ 45    Ms. Blanks again took the stand. She testified that J.B.'s foster placement with Ms. Taylor was safe and appropriate and that there were no signs of abuse, neglect, corporal punishment, or a risk of harm. Ms. Taylor had signed a permanency commitment indicating that she wished to adopt J.B. and had followed through with J.B.'s medical care and recommended services. Ms. Blanks had observed J.B. interact with Ms. Taylor on more than five occasions, and with Ms. Taylor's

adult son on one occasion, and saw that they had affectionate mother-daughter and brother-sister relationships with J.B. It was her recommendation, following consultation with her supervisor, for the parental rights of both parents to be terminated so that Ms. Taylor could adopt J.B.

¶ 46    On cross-examination by K.S.'s counsel, Ms. Blanks stated that, if parental rights were terminated, she did not believe Ms. Taylor would be willing to maintain visits between J.B. and J.B.'s older siblings. At least, she clarified, Ms. Taylor had not given her "a straight answer" to that question.

¶ 47    R.B.'s counsel stated that R.B. was overcome with emotion and had elected not to testify during this portion of the hearing. Counsel was given permission to instead call Keyonna B., his mother and J.B.'s paternal grandmother. Ms. B testified that R.B. had grown up in Rogers Park and was still close to a number of relatives living in the Chicago area. She agreed that he had had a "normal thriving childhood" and was "a very good student and a good kid." She acknowledged that he had made some bad decisions over the last few years. Ms. B. had seen J.B., when this case was first initiated, but had been unable to obtain custody of her because she lived across the state line in East Chicago, Indiana. She provided her contact information several times, but lost track of who the caseworker was because "it kept changing."

¶ 48    If R.B.'s parental rights were not terminated, Ms. B. stated that she would "[b]ack her son up 100 percent." J.B. would have contact with their large family and be part of their holiday gatherings. "[T]hat's my grand baby, and I don't even know her," Ms. Brandy said. She wanted her son to get to know his daughter and for them to start bonding. She believed he "ha[d] the stable mind to be in his daughter's life and watch her grow."

¶ 49    The State argued that J.B. was two years old and deserved permanency. Ms. Taylor had testified credibly that J.B. was in a safe and loving home; had bonded with her foster mother, foster

brother, and extended foster family; and had ties to the community through her daycare and neighborhood friends and activities. Although not legally required to do so, Ms. Taylor also appeared willing for J.B. to know about her biological relatives.

¶ 50 Counsel for the minor agreed that a termination of parental rights was in J.B.'s best interest but requested mediation to discuss sibling visitation. "The problem with mediation," the court said, was that "once the child [was] adopted, the adoptive mother [could] ignore everything" because she would be the parent.

¶ 51 Counsel for R.B. argued that a termination of his parental rights was in fact a termination of J.B.'s right to know her father. She would want to know him and his extended family one day, counsel argued, and the court should "leave the door open" for her to do that.

¶ 52 The court found by a preponderance of the evidence that it was in J.B.'s best interest to terminate the parental rights of both parents. The judge acknowledged that this was an extremely difficult decision because it was so final. He explained that his own parents had passed through the juvenile court system, and that he believed his mother had suffered by being separated from her biological parents, even though she was adopted by a wonderful family. He still believed, however, that it was in J.B.'s best interest for parental rights to be terminated so that she could be adopted. He wished R.B. good luck, said it was "a close case," and urged him to appeal.

¶ 53                                    II. JURISDICTION

¶ 54 The trial court terminated R.B.'s parental rights to J.B. on May 14, 2025, and R.B. timely filed his notice of appeal on June 12, 2025. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), which together govern appeals from final judgments in civil cases, and under Illinois Supreme Court Rule 660 (eff. Oct. 1, 2001), which governs appeals in cases arising under the Juvenile Court Act.

¶ 55                                  III. ANALYSIS

¶ 56    A termination of parental rights pursuant to the Juvenile Court Act involves a two-step process. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). There must first be a threshold showing, based on clear and convincing evidence, that the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *Id.* Only where a showing of unfitness has been made does "the court then consider[ ] whether it is in the best interests of the child that parental rights be terminated." *Id.* Here, R.B challenges both the trial court's unfitness finding and its finding that it was in J.B.'s best interest to terminate his parental rights and set a permanency goal of adoption. We address each argument in turn.

¶ 57                          A. The Court's Unfitness Finding

¶ 58    "Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed 'unfit,' any *one* ground, properly proven, is sufficient to enter a finding of unfitness." (Emphasis in original.) *In re C.W.* 199 Ill. 2d at 210. Ground (b), relevant here, is satisfied where the trial court finds by clear and convincing evidence that there has been a "[f]ailure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2024)). We defer to the trial court's findings because its opportunity to view and evaluate the witnesses and their testimony is superior to ours (*In re Brown*, 86 Ill. 2d 147, 152 (1981)) and will reverse only where a finding is against the manifest weight of the evidence, *i.e.*, "where the opposite conclusion is clearly apparent" ((internal quotation marks omitted) *In re M.I.*, 2016 IL 120232, ¶ 21).

¶ 59    R.B. first argues the trial court erred as a matter of law by reading into the Adoption Act a *per se* rule requiring a finding of parental unfitness whenever a parent has lost contact with the agency, regardless of the circumstances that may have led to that loss of contact. We agree with

R.B. that circumstances which may legitimately have prevented a parent from consistently visiting his or her child or otherwise making progress toward a return home are indeed relevant to a court's fitness determinations. "Courts must consider a parent's efforts in the context of the circumstances in which they occur, including any difficulties that hinder those efforts" (*In re D.D.*, 2022 IL App (1st) 220410, ¶ 82), and must "examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts." *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990). This court has accordingly recognized that "circumstances such as difficulty in obtaining transportation, poverty, actions and statements of others that hinder visitation, and the need to resolve other life issues are [all] relevant." *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 35.

¶ 60    The trial court here, noting that the usual progression is from weekly and twice-weekly supervised visits to unsupervised visits and, finally, to a return home, observed that "in this case it didn't happen" and said, "so I believe the law mandates that I must make a Finding of Unfitness by clear and convincing evidence." R.B. takes these statements out of context, concluding that the court believed this was the end of the matter and that there was no reason for it to even consider the circumstances that hampered visitation in this case. But the record as a whole does not support this reading.

¶ 61    The court did consider the reasons R.B. gave for not visiting his daughter for a year-and-a-half—the apartment fire, significant turnover at the agency, his incarceration—as well as the efforts that he had made to restart visitation. The court felt it "must" make a finding of unfitness not because those circumstances were irrelevant but because, in the court's view, they were ultimately insufficient to excuse the lengthy period during which R.B. lost all contact with his daughter and the agency. The court clearly empathized with R.B., viewing him as "a decent young man" who was "overwhelmed and facing a lot of challenges" and agreed with him that the agency

17

"could have done better." But it was ultimately R.B.'s responsibility to demonstrate a reasonable degree of interest, concern, or responsibility for J.B.'s welfare (see 705 ILCS 405/1-5 (West 2024) (providing that "parents must *** correct the conditions that require the child to be in care, or risk termination of their parental rights"), and, even considering all of the obstacles he faced, the court could not conclude that R.B. had done so.

¶ 62    This finding was not against the manifest weight of the evidence. R.B. testified that he lost all of his paperwork, including the contact information he had for J.B.'s caseworker and for his own court-appointed lawyer, in an apartment fire. By the time he was able to make contact with J.B.'s mother, K.S., the caseworker had changed, and his efforts to reach someone at the agency were unsuccessful. As counsel for the minor points out, however, R.B. could surely have located his court-appointed lawyer, whose contact information was contained in court filings, to assist him in these efforts. At the time of the termination hearing, J.B. had just turned two years old, and she had not seen R.B. in approximately a year-and-a-half. Despite his early efforts to build a relationship with her and his demonstrated enthusiasm for doing so, that extended period of no contact had resulted in her not knowing him at all and had halted his progress with reunification services. Although the trial court clearly understood that R.B. had faced difficulties in maintaining contact with J.B.—including what R.B. describes on appeal as the "disjointed" handling of this case by the agency, marked by a rotating door of caseworkers, a lack of continuity and clear communication, and a clear focus on documenting the biological mother's case—the court did not believe that those difficulties were sufficient to excuse R.B.'s complete absence for such an extended period of time.

¶ 63    Although we are sympathetic, as the trial court was, to the hurdles R.B. faced and believe the record reflects how much he wished to be a part of his J.B.'s life, we do not find the opposite

18

conclusion readily apparent. To be sure, as R.B. points out, there are cases in which there were even more prolonged periods without visitation, and less evidence of parental interest or concern. But, as we have noted on many occasions, the *sui generis* nature of cases involving parental rights make such comparisons generally unhelpful. See *In re Scarlett Z.-D.*, 2014 IL App (2d) 120266-B, ¶ 65. The trial court's finding that the State proved by clear and convincing evidence that R.B. failed to maintain a reasonable degree of interest, concern, or responsibility for J.B.'s welfare was not against the manifest weight of the evidence.

¶ 64                                 B. Termination of Parental Rights

¶ 65     R.B. also challenges the trial court's finding that it was in J.B.'s best interest to terminate his parental rights and set a permanency goal of adoption. Once a parent has been found unfit pursuant to one or more grounds set out in the Adoption Act (750 ILCS 50/1(D) (West 2014)), the State must establish by a preponderance of the evidence that it is in the minor's best interest to terminate parental rights. *In re D.T.*, 212 Ill. 2d 347, 367 (2004). The trial court must consider all matters bearing on the child's welfare (*In re Violetta B.*, 210 Ill. App. 3d 521, 534 (1991)), including the following factors listed in section 1-3 of the Juvenile Court Act:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and religious;
>
> (d) the child's sense of attachments, including:
>
> > (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

19

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2024).

¶ 66    The court may also consider "the nature and length of the child's relationship with her present caretaker and the effect that a change in placement would have upon her emotional and psychological well-being." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. The focus shifts at this point in the proceedings; "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. As with the court's findings at the unfitness stage, we will only overturn its findings at this stage if they are against the manifest weight of the evidence. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 20.

¶ 67    R.B. insists that the trial court here "completely mishandled" its best interest determination because the trial judge failed to specifically reference the statutory best interest factors, did not "consider[ ] the effect of cutting J.B. off from [R.B.] and his extended family," and used the judge's

own personal experiences with adoption "as his only guide." We do not agree with this assessment. "[T]he trial court is not required to explicitly mention each factor listed in section 1-3(4.05) when rendering its decision." *In re Deandre D.*, 405 Ill. App. 3d 945, 954 (2010). "In fact, the court need not articulate any specific rationale for its decision," and, as the reviewing court, we "need not rely on any basis used by [the] trial court below in affirming its decision." *Id.* at 954-55. The trial court here, far from ignoring the implications of a termination of parental rights on J.B.'s ability to know R.B. and his extended family, specifically acknowledged that circumstance. Indeed, that appears to have been the point of the judge's comment regarding his own mother's adoption. He recognized that she had suffered by being separated from her biological parents, even though she was adopted by a caring family. The record does not support R.B.'s assertion that the trial judge, who specifically referenced the Act, used personal experiences like these as either "a substitute for a statutory evaluation" or "as his only guide."

¶ 68    The evidence presented here absolutely supported the trial court's finding that a termination of parental rights was in J.B.'s overall best interest. The uncontested testimony of J.B.'s foster mother, corroborated by the agency caseworker, was that J.B. had been in a safe, appropriate, and stable placement for over two years; was well-bonded to her foster family; and was thriving, receiving appropriate medical care and services and making ties to her extended foster family and community. The foster mother was committed to J.B.'s permanency through adoption and remained open to the possibility of her having future contact with her biological parents. Nothing in the record, on the other hand, indicated that J.B. could be returned to R.B. at any point in the near future.

¶ 69    R.B. points out that the termination of his parental rights may deprive J.B. of contact with her half-siblings and with R.B. and his own extended family. That is, of course, possible. As the

trial court itself acknowledged, post-adoption decisions regarding J.B.'s care will be made by her adoptive parent. But the nature and extent of such relationships, which do not presently exist, are speculative. We cannot say that they outweigh the very real and stable life and connections the trial court concluded had already been established for J.B. with her foster family. The court's finding that the State proved by a preponderance of the evidence that the termination of R.B.'s parental rights was in J.B.'s best interest was simply not against the manifest weight of the evidence.

¶ 70                                    IV. CONCLUSION

¶ 71    For all of the above reasons, we affirm the trial court's finding of unfitness pursuant to ground (b) of the Adoption Act (750 ILCS 50/1(D) (West 2024)) and its finding, pursuant to section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29) (West 2024)) that a termination of R.B.'s parental rights was in J.B.'s best interest.

¶ 72    Affirmed.